IN THE MATTER OF THE ESTATE OF ALICE DUPONT ORTIZ, DECEASED.

*New Castle, July 29, 1942.*

*Robert H. Richards,* of the firm of Richards, Layton and Finger, for petitioner.

*Arthur G. Logan,* of the firm of Logan and Duffy, for Marguerite Ortiz Boden.

*John J. Morris, Jr.,* of the firm of Hering, Morris, James and Hitchens, for Alexia Ortiz Krebs.

*William S. Potter,* of the firm of Southerland, Berl, and Potter, for Laird & Co., a creditor.

*William L. Hennessy, in pro. per.*

THE VICE-CHANCELLOR: In addition to a prayer for the issuance of the rule to show cause, the relief sought is that this court make an order approving the offers of com-

promise, set forth in the petition, of certain claims of the estate against others. The most important claims arise out of transfers made by the decedent during her life, alleged and charged to be in fraud of her creditors. To grant the relief prayed for, it would be necessary that the following questions be answered in the affirmative:

(1) Has this court jurisdiction to entertain the petition?

(2) Assuming that the estate is insolvent and that the transfers were in fraud of creditors, is the executor authorized, for the purpose of paying claims of creditors defrauded, to sue for and recover the property transferred, and consequently, to compromise the causes of action based upon the fraudulent conveyances?

(3) Are the terms of the proposed compromise of such character as to warrant approval by this court?

Mrs. Ortiz died on November 5, 1940, a resident of New Castle County. The petitioner qualified as executor under her will. After having paid the larger part of the indebtedness, the executor now holds cash and property, at its appraised value, in the amount of $280,371.16. The remaining liabilities, including estimated administration costs, aggregate $531,946.89. The executor alleges, and it appears from the foregoing, that the estate is insolvent.

The compromise of which approval is presently sought relates to three classes of claims, which will be described separately.

#### CLAIMS BASED ON ANNUITY CONTRACTS

In December 1934, Mrs. Ortiz entered into a contract with an insurance company, known as a retirement income contract. In consideration of the payment by her of yearly premiums for ten years, the insurance company agreed to pay her an annuity, beginning in December 1944 and continuing throughout her life. It further agreed to pay to

her executors, administrators, or assigns the net cash value of the contract at the date of her death, in the event she should die before December 28, 1944. About ten days prior to her decease, Mrs. Ortiz caused a change in the beneficiary of the contract to be made so that upon her death prior to 1944, the net cash value would be payable to her daughters, Mrs. Boden and Mrs. Krebs, in equal shares. After the death of Mrs. Ortiz, the company paid to each daughter the sum of $73,012.81. The executor alleges that the change of beneficiary and transfer of the proceeds of the contract were fraudulent as to the creditors of Mrs. Ortiz, on the grounds that they were made without a fair consideration; that Mrs. Ortiz was insolvent when they were made; that she was thereby rendered insolvent; that her property remaining after the change and transfer was unreasonably small capital for the business or transaction in which she was engaged; that they were made with actual intent on her part to hinder, delay, and defraud her then existing and future creditors, all within the meaning and contemplation of the fraudulent conveyances act, *Rev. Code of Del. 1935, Chap.* 174.

In January 1934, prior to the date of the contract just discussed, Mrs. Ortiz had entered into two other similar retirement income contracts. The net cash values of these were made payable, in one, to Mrs. Boden, and in the other, to Mrs. Krebs, in the event Mrs. Ortiz should die before January 11, 1944. Mrs. Ortiz paid the premiums until her death. Thereafter, the insurance company paid to each of the daughters the sum of $76,559, pursuant to the contracts. The executor contends that each payment of annual premiums was fraudulent as to creditors for the same reasons alleged with respect to the contract of December 1934.

The executor further contends that all sums paid to the daughters under the three annuity contracts were impressed with a constructive trust for the benefit of the creditors of Mrs. Ortiz, to the extent that such amounts

might become necessary to be used to pay her debts; and that it is the duty of the executor to institute appropriate proceedings to recover the proceeds of the contracts. The daughters have denied that the claims above described can be successfully enforced against them. They take the position that the executor may not properly sue on account of the claims; that the estate is not insolvent; that the payments of premiums on the two contracts of January 1934 were not fraudulent conveyances when made; that, in any event, there could be no recovery based on such payments of premiums, except for those made within a period of three years prior to the death of Mrs. Ortiz, for reason that recovery would be barred by the statute of limitations; and lastly, that they have no property out of which any judgments against them could be collected.

### LAIRD AND COMPANY ACCOUNTS.

The executor discovered that some securities belonging to Mrs. Ortiz were pledged to secure brokerage accounts, one in the name of Mrs. Boden, and the other in the name of Mrs. Krebs. Pursuant to the executor's direction, the broker sold Mrs. Ortiz' securities in each account, and paid over the proceeds to the executor after deducting the balances due the broker in each account. The executor claims that the daughters are indebted to the estate in the amounts so deducted by the broker; in the case of Mrs. Boden, the sum of $4,587.76; and in the case of Mrs. Krebs, the sum of $2,062.17. The daughters say that the accounts were opened by their mother, controlled by her, and were, in fact, her accounts. They deny that they have any interest in the securities in the accounts, or equitable responsibility for indebtedness arising out of the accounts.

### CONTROVERSY WITH FIDELITY-PHILADELPHIA TRUST COMPANY.

Mrs. Ortiz' father created a trust of which Fidelity-

Philadelphia Trust Company of Philadelphia, Pennsylvania, is the trustee. The terms may, for present purposes, be stated thus: to pay income to Mrs. Ortiz for her life, and upon her death to distribute the corpus to her two daughters, in equal shares. Hence, after Mrs. Ortiz' death, her executor became entitled to the undistributed income properly apportioned to the date of her death. It has been calculated that the income thus payable to her executor is the sum of $17,359.12, if the Pennsylvania rule of apportionment should be followed; or the sum of $3,320.06, if the Delaware rule of apportionment should be followed. The difference between the two computations, that is, $14,039.06 is the amount in controversy. The executor, having been advised by counsel that the Pennsylvania rule is properly applicable, has demanded the larger sum. The trustee has declined to pay this sum.

Prior to Mrs. Ortiz' death, the daughters assigned their equitable future interests in the trust to certain persons upon further and new trusts. However, they are apparently in a position, because of their interests under the new trusts, to persuade the trustee of the original trust as to what rule it should follow in apportioning income to the date of Mrs. Ortiz' death. To obtain an adjudication of this controversy, it would be necessary to initiate proceedings against the trustee in an appropriate court in Pennsylvania.

After extended negotiations between Mrs. Ortiz' executor and the attorneys for the daughters, the latter have each submitted an offer of compromise of all the claims and controversies above discussed. In effect, the offers provide that the executor shall receive the sum of $80,000 to be paid in the following manner: the daughters will withdraw all opposition to the payment by Fidelity-Philadelphia Trust Company, to the executor, of the trust income apportioned under the Pennsylvania rule, and will cause the amount so computed to be paid, and thus the executor will receive the total amount in dispute, being $14,039.06; each daughter

will pay to the executor the sum of $32,980.47, or together, $65,900.94, to be used in whole or in part for the payment of indebtedness of the estate. The conditions of the compromise are these: first, that the executor shall abandon its claims against the daughters based on the Laird and Company accounts; second, that in an appropriate proceeding the Chancellor shall make an order or decree to the effect that the executor is a trustee for the creditors of the estate with respect to the claims, or causes of action based upon the annuity contracts, and that the executor shall, if the compromise is approved and consummated, release the daughters from liability arising out of such claims; and third, that in case the estate shall eventually turn out to be solvent, the executor shall return to the daughters, in equal amounts, such part or all of the sum of $65,900.94 as may not be required to pay debts of the estate.

It is alleged in the petition that it is the considered judgment of the executor that the offers of compromise are fair and reasonable under all the circumstances and should be accepted; but that the executor has been advised that it cannot settle the claims based upon the annuity contracts, without the approval of the Chancellor after a full hearing of the matter and notice issuing out of the Court of Chancery to each of the creditors of the estate, as well as to the two daughters.

Postponing an examination of the matter of jurisdiction, I shall first consider the question whether the executor is authorized to sue to set aside transfers alleged to be in fraud of the decedent's creditors. If it be found that this authority exists and that the proposed settlement is fair, it would follow that the executor is empowered to release the transferees from liability arising out of the transfers.

It is elementary that an executor, in order to pay the decedent's indebtedness, may collect by legal proceedings or otherwise and apply the personal property owned by the decedent at the time of his death. As appears from author-

ities cited later, it has frequently been said that an executor stands in the shoes of the decedent, and has no greater or other rights or powers than the decedent would have if living. Now, there seems to be no doubt that as between a fraudulent transferor and the transferee, the former is bound by his act, and has no right of action against the transferee to recover the property fraudulently transferred. It is likewise well settled that the executor of a fraudulent transferor cannot recover such property for the purpose of distributing it to the donees under the decedent's will, or to the distributees under the intestate laws. But the question of the executor's power, when the estate is insolvent, to recover from such fraudulent transferees in order to pay the claims of the creditors defrauded, is affected by different considerations.

There is no statute in Delaware, as there is in some states, expressly conferring upon executors or administrators authority or power of the character just stated. On the other hand, we have no statute which expressly or by implication denies such power; and the subject has not been considered in any reported Delaware case which has come to my attention. In other jurisdictions having no statute expressly providing for the situation, there is a conflict of authority. *Annotation*: 50 *L.R.A.* (*N.S.*) 320; *Annotation*: 91 *A.L.R.* 135; 23 *C. J. pp.* 1155, 1156; 1 *Moore on Fraudulent Conveyances,* § 16; 2 *Woerners The American Law of Administration,* § 296.

*Section* 3837 *of the Revised Code of Delaware* (1935), *as amended by* 41 *Laws of Delaware, C.* 191, *pp.* 629-631, imposes upon executors and administrators the mandatory duty of paying demands against the deceased in a certain prescribed order. Without discussing numerous other sections concerning the probate of debts and the payment of indebtedness by the personal representatives, it is plain that the latter owe a duty to pay the claims of creditors of the decedent. It is thus important to determine whether the

executor's duty to pay debts includes or implies the power to enforce rights arising out of the decedent's fraudulent transfers, for the benefit of the creditors defrauded. Stated otherwise, the problem is whether causes of action arising out of the decedent's fraudulent transfers are property to which the personal representative may resort in order to perform his duty to pay the claims of the creditors defrauded.

It would seem desirable that the personal representative should be permitted to pursue assets fraudulently transferred. Otherwise, the creditors must go without remedy, or bring separate suits in their own names, "thus involving a multiplicity of suits and interfering with the singleness of the administration." *Cooley v. Brown*, 30 *Iowa* 470, 473. Of course, to say that an executor may apply to the payment of claims only such property as the decedent himself could have applied, merely solves the problem by assuming the answer; for, as previously stated, a fraudulent transferor cannot, for the purpose of paying his debts or for any other purpose, recover the property transferred. However, such an assumption is not made necessary by any rule of law in this state. Notwithstanding that a fraudulent transferor does not retain the right to recover the property himself, he is unable to transfer to or vest in the transferee absolute ownership of the property, free from the rights of creditors defrauded. These rights are enforceable by the creditors themselves; and it seems entirely reasonable that they should also be enforceable, when the transferor dies insolvent, by his executor or administrator who is charged with the duty of paying the claims of such creditors.

That an executor in dealing with certain property should owe duties only to creditors, and not to the distributees of personalty, is not novel in our law. Where the personal property of a decedent is insufficient to pay his debts, the executor may, by proceeding in the Orphans' Court, resort to the real estate; but in so doing he performs

a duty owed solely to creditors entitled to the proceeds of sale, in the order of priority fixed by statute. *Rev. Code of Del.* 1935, §§ 3877, 3887. He may obtain the sale only of so much land as is necessary to pay the debts. *Rev. Code,* § 3879. If there be any surplus from the proceeds of sale after paying debts, this is distributable, not as personalty, but to those entitled to the land sold. *Rev. Code,* § 3888.

The idea that an executor should be able to enforce rights which were unenforceable by the decedent has an interesting parallel in the law of receiverships. Referring to the right of a receiver or trustee in bankruptcy to sue on account of a fraud perpetrated on a corporation by persons occupying a fiduciary relation toward it, where all of the stockholders consented to the fraudulent transaction with knowledge of the facts, Chancellor Harrington said, in *Bovay, v. H. M. Byllesby & Co., ante, p.* 69, 78, 22 *A.* 2*d* 138, 142:

"But, whatever the rights of individual creditors may be in such cases, the precise question is whether trustees in bankruptcy, largely acting for them, can have any greater rights than the corporation could have had. In the distribution of the assets of a bankrupt corporation, a receiver occupies a position toward both creditors and stockholders somewhat analogous to that of a trustee. *High on Receivers,* §§ 314, 315; *Curtis v. Leavitt,* 15 *N. Y.* 9; *Alexander v. Relfe,* 74 *Mo.* 495. In enforcing alleged rights of action in the collection of corporate assets, he usually acts as the representative of the corporation, and has no greater rights or powers. *High on Receivers,* § 315; *Curtis vs. Leavitt, supra; Alexander v. Relfe, supra.* Where, however, the insolvent corporation has perpetrated a fraud on its creditors, by an illegal and improper disposition of its assets, a somewhat different situation arises. *High on Receivers,* § 315; *Curtis v. Leavitt, supra; Alexander v. Relfe, supra.* Under such circumstances, it seems that the receiver may enforce the rights of creditors, and, in so doing, has even greater rights than the corporation could have had. *High on Receivers,* § 315; *Curtis v. Leavitt, supra; Alexander v. Relfe, supra; Hamor v. Taylor-Rice Eng. Co., (C. C.)* 84 *F.* 392. *McCandless v. Furlaud, supra* [296 *U. S.* 140, 56 *S. Ct.* 41, 80 *L. Ed.* 121], apparently applied that eminently practical rule."

After careful consideration of the pertinent authorities, I have concluded that an executor or administrator of a

fraudulent transferor has the power to sue to recover the property transferred, for the purpose of paying the claims of creditors defrauded, where the estate is insolvent and where the creditors have not already enforced their rights. *Stewart v. Kearney,* 6 *Watts,* (*Pa.*) 453, 31 *Am. Dec.* 482; *Chester County Trust Co. v. Pugh,* 241 *Pa.* 124, 88 *A.* 319, 50 *L. R. A.* (*N. S.*) 320, *Ann. Cas.* 1915*B*, 211; *Finnegan v. LaFontaine,* 122 *Conn.* 561, 191 *A.* 337; *Cooley v. Brown,* 30 *Iowa* 470, 471; *Schwalber v. Ehman,* 62 *N. J. Eq.* 314, 49 *A.* 1085; *Frost v. Libby,* 79 *Me.* 56, 8 *A.* 149; 3 *Schouler on Wills, Executors and Administrators,* (6th Ed.) §§ 2040, 2153. Some of these authorities state that an executor or administrator is a trustee for creditors, or that he may attack fraudulent conveyances as a trustee for creditors. It seems to me that these and similar statements were not intended to mean that he is a trustee in the strict sense of the term, and for all purposes, as for example, for the purpose of accounting. In a broad sense, an executor or administrator may be said to be a trustee for creditors, for he holds property and owes a duty to deal with it for the benefit of this definite class of persons, and his relation to them is a fiduciary one; and similarly he may be called a trustee for the distributees, because of the duties he owes them in administering the estate. 1 *Scott on Trusts,* § 6. Hence, the references to an executor as a trustee for creditors would seem to be but a convenient method of expression to indicate that he is charged with the duty to deal with property for the benefit of creditors, with respect to whom he stands in a fiduciary relation.

*Sections* 9 *and* 10 of the Delaware fraudulent conveyances act, *Rev. Code of Del.* 1935, § 6067, 6068 provide certain remedies for creditors of a fraudulent transferor. Neither these nor other sections of the act purport to deal with the power of an executor or administrator of the transferor, above discussed. Certainly, no reason appears why

the act should be construed to be inconsistent with or to negative the existence of such power.

We come now to the question of the jurisdiction of the Court of Chancery to entertain this proceeding. In Delaware, by constitutional and statutory provisions, the administration of decedents' assets is largely confided to the Register of Wills as a judicial and as an accounting officer, and to the Orphans' Court. However, none of these provisions expressly confer jurisdiction upon either the Register of Wills or the Orphans' Court to consider or act upon a proposed compromise by a personal representative of claims of the estate against other persons.

The Court of Chancery of this State and other courts of equity in the United States still have a considerable field of jurisdiction in matters relating to the administration of estates of deceased persons. 1 *Pomeroy's Equity Jurisprudence, (Fifth Edition)* § 156; 4 *Id.* § 1153. It is well established that equity has and will exercise jurisdiction in cases concerning the administration of estates, which have been omitted from the constitutional or statutory grant of probate jurisdiction to other courts, or for which the methods or relief available before such courts are imperfect or inadequate. 4 *Pomeroy's Equity Jurisprudence,* § 1154a; 30 *C. J. S., Equity.,* § 61, *pp.* 405-410. An instance of such exercise of jurisdiction by this court may be found in suits by executors for the construction of wills.

In the present case, the sums involved are large, and the compromise or settlement would affect substantially the financial interests of persons to whom the executor owes duties as a fiduciary. The questions necessary to be considered, in deciding upon the advisability of the settlement, are of a difficult character. Having determined that it is advisable, the executor may not reasonably be expected to act without the protection afforded by judicial approval, after a hearing at which all parties interested may appear and assert their positions with respect to the proposed

action. No adequate relief is available to the executor before the Register of Wills or the Orphans' Court. Accordingly, the jurisdiction of this court and the propriety of its exercise have been sufficiently demonstrated.

The final question is whether the terms of the compromise should be approved. The executor has stated its reasons for concluding that they are fair and in the interests of the creditors of the estate. The executor does not believe that recoveries could be had in actions based upon the claims arising out of the Laird and Company accounts, and states its willingness to take the responsibility of abandoning them. It asserts that the controversy with Fidelity-Philadelphia Trust Company involves a question of conflict of laws, the decision of which is by no means certain, and that the final adjudication of the question may involve protracted litigation. It alleges that all of the objections made by the decedent's daughters to the claims based on the annuity contracts, except the contention that the executor may not enforce the claims, involve difficult questions of law and fact, would be difficult to litigate, and that the outcome is doubtful. These reasons seem plausible in the light of the facts disclosed.

The claims of unpaid creditors who would be affected by the compromise aggregate $464,446.89. None of the creditors has objected to the compromise, although all were given notice as directed by the order of this court, and two of the creditors whose claims together amount to $441,027.61 did appear at the hearing.

The matters to be considered and the nature of the consideration generally required in questions of this character are well stated in the brief of the learned solicitor for the petitioner, as follows:

"When a court is called upon to approve a settlement and compromise of a pending litigation; or to authorize a trustee, or receiver, or other fiduciary having the right to apply to the court to make a settlement or compromise of claims that might become the subject of litigation; the court is not required to try out all the issues involved

or to decide any of them on their merits. The court is only called upon to consider the nature of the claims and the nature of the possible defenses and the situation of the parties and exercise what may be called business judgment in determining whether the proposed compromise is reasonable in the circumstances.

"The principal matters that should be considered by the court, in reaching a conclusion to approve or disapprove the proposed compromise, have frequently been stated to be,—

"(1) The probable validity of the claims.

"(2) The apparent difficulties in enforcing the claims through the courts.

"(3) The collectibility of any judgment recovered.

"(4) The delay, expense and trouble of litigation.

"(5) The amount of the compromise as compared with the amount and collectibility of a judgment.

"(6) The views of the parties involved, pro and con.

"Upon a consideration of these factors, a conclusion must be arrived at as to whether or not a compromise is for the best interests of the claimant."

Testing the facts by these considerations, I am of the view that the offers are for the best interests of the estate and should be approved.

An order accordingly will be advised.