**COURT OF CHANCERY**
**OF THE**
**STATE OF DELAWARE**

SELENA E. MOLINA
MASTER IN CHANCERY

LEONARD L. WILLIAMS JUSTICE CENTER
500 NORTH KING STREET, SUITE 11400
WILMINGTON, DE 19801-3734

Final Report: May 31, 2023
Date Submitted: February 1, 2023

Jason C. Powell, Esquire
Thomas Reichert, Esquire
The Powell Firm, LLC
1813 N. Franklin St.
Wilmington, DE 19802

Thomas A. Uebler, Esquire
Kathleen A. Murphy, Esquire
McCollom D'Emilio Smith Uebler LLC
2751 Centerville Road, Suite 401
Centerville, DE 19801

Re:    *Karen Brady v. Elaine S. Huber, et al.*,
       C.A. No. 2019-0204-SEM

Dear Counsel:

Pending before me is a motion to enforce a settlement agreement. Despite multiple representations among the parties and to this Court that the above-captioned matter had been settled, one side refused to sign the final memorialization of the agreements reached. This refusal comes too late—the parties reached a binding, enforceable agreement. The motion should be granted.

## I.    BACKGROUND

This case arises from the estate of George H. Huber, Sr. (the "Decedent"). The Decedent began his estate planning on April 10, 1990, when he executed a declaration of trust (the "Trust").[1] Then, twenty-five (25) years later, in 2015, the

---

[1] Docket Item ("D.I.") 1 ¶ 8.

Decedent executed a will (the "Will") and a restatement of the Trust (the "Restatement").[2] Finally, on June 27, 2018, the Decedent executed a first amendment to the Trust (the "Amendment").[3]

The Will, the Restatement, and the Amendment reflected the Decedent's final wishes when he passed on September 15, 2018, at 94 years old.[4] The Decedent was survived by his daughter, Karen Brady (the "Plaintiff"); his son, George H. Huber, Jr.; and his wife, Elaine S. Huber (the "Defendant," together with the Plaintiff, the "Parties").[5] The Defendant petitioned for her appointment as executor, which was granted and the Will was admitted to probate on November 19, 2018.[6]

---

[2] *Id.* at ¶¶ 9, 11.

[3] *Id.* at ¶ 12.

[4] *Id.* at ¶¶ 2-3.

[5] *Id.* at ¶¶ 4-5. The Decedent had two children who predeceased him. *Id.* at ¶ 4. The Defendant was his third wife; they did not have any children together. *Id.* at ¶ 5. The interested parties in this action are George H. Huber, Jr., Nora L. Huber (the Decedent's daughter-in-law), and the children of Dennis Huber, Jr. *See* D.I. 22 ¶ 5.

[6] D.I. 1 ¶ 2.

## A.    Procedural Posture

On March 14, 2019, the Plaintiff filed the complaint in this action (the "Complaint").[7]    The Plaintiff contends that the Decedent developed and was diagnosed with dementia around 2014.[8]    Thus, she sought to invalidate the estate-planning documents signed thereafter for lack of capacity or undue influence.[9]

But when the Complaint was filed, the Parties were already engaged in settlement discussions.[10]    These continuing discussions looked, to the Court, like inaction and a letter warning of possible dismissal was sent by my staff on May 13, 2020.[11]    The Plaintiff timely responded, through counsel, and explained that "[t]he settlement discussions have been prolonged and protracted, but are extremely complicated, involving significant trust issues, real property issues, estate issues and tax considerations."[12]    Nonetheless, the Plaintiff wished to continue pursing

---

[7] D.I. 1.

[8] *Id.* at ¶¶ 1, 13.

[9] D.I. 1.

[10] D.I. 3.

[11] D.I. 2.

[12] D.I. 3.

settlement, while leaving this matter open.[13]  I granted that request and ordered the

Parties to file an update on the status of their negotiations within sixty (60) days.[14]

After two status reports reflecting continued discussions, the Plaintiff, in

November 2020, began to move the litigation forward.[15]  At the Plaintiff's request,

summonses were issued, the Defendant was served, and, through counsel, the

Defendant answered the Complaint on December 1, 2020.[16]  But the Parties

continued to negotiate rather than litigate.  On November 15, 2021, the Plaintiff's

counsel submitted another status report, with the consent of the Defendant's

counsel.[17]  The Parties explained that they had successfully mediated the matter and

had reached a settlement in principle.[18]  But disputes arose in memorializing that

agreement.[19]  The Parties explained they were "committed to continuing towards an

amicable resolution to be presented to the Court[,]" but warned, if they could not

resolve their disputes, "it is very likely that competing motions to enforce a

---

[13] *Id.*

[14] D.I. 4.

[15] *See* D.I. 5, 7.

[16] D.I. 8, 9, 11, 13, 14.

[17] D.I. 17.

[18] *Id.*

[19] *Id.*

settlement agreement will be filed with the Court for its consideration and resolution in that manner."[20]

That warning ultimately proved apt. But not initially. On February 22, 2022, counsel for the Plaintiff reported "that the [P]arties have reached a complete resolution of this matter. It has been documented and is in the process of being signed."[21] Counsel for the Defendant was copied on the letter but filed no response or rebuttal. And the drafts were never executed. Thus, on July 22, 2022, the Plaintiff filed a motion to enforce and approve the settlement agreement (the "Motion").[22]

The Motion went unanswered for over one month. On August 24, 2022, I issued a letter order directing: "The [M]otion will be granted as unopposed unless a response in opposition is filed by September 9, 2022."[23] That same day, the Defendant's counsel filed a substitution and, shortly after approval, the Defendant's new counsel sought an extension to respond to the Motion and served discovery.[24] I granted that request, in part, ordering a response by September 23, 2022.[25]

---

[20] *Id.*

[21] D.I. 19.

[22] D.I. 22.

[23] D.I. 23.

[24] D.I. 24-27.

[25] D.I. 28.

The Motion was fully briefed on October 24, 2022 and heard on February 1, 2023 where an evidentiary record regarding the settlement discussions was developed.[26] The hearing also served as a forum through which any interested parties could appear and be heard regarding the proposed settlement; no one appeared in opposition.[27]

At the conclusion of the hearing, I took the Motion under advisement.[28]

B.      Evidentiary Record[29]

The Parties had been negotiating since before the Complaint was filed in March 2019. But it was only with the assistance of their mediator, David White (now Chief Disciplinary Counsel), that they reached a resolution. The Parties jointly contacted Mr. White in November of 2020.[30] After conflicts cleared, Mr. White provided dates in December, then January, then February.[31] Ultimately, the Parties selected February 18, 2021.[32]

---

[26] D.I. 31, 44.

[27] D.I. 44.

[28] D.I. 46 ("Tr.") 62:5-11.

[29] The record consists of Exhibits 1-17, admitted without objection at the February 1, 2023 hearing. D.I. 44.

[30] JX 4, p.1.

[31] *Id.* at p.2-6.

[32] *Id.* at p.6.

When the Parties began mediation on February 18, 2021, they already had agreement on some issues the Plaintiff's counsel described as "not insignificant."[33] But one day of mediation was not enough to get them to a final resolution. After day one, in an email to counsel, Mr. White explained the Parties made "significant progress" and he was hopeful they could "get this finalized on Monday"—February 22, 2021.[34] Monday, presumably, was productive and discussions continued.

The Parties appeared to reach a resolution on or around February 26, 2021. Mr. White communicated that resolution by email, explaining that the Plaintiff had accepted the Defendant's "last counter-offer[.]"[35] Mr. White explained his understanding of the counter, but the Defendant's counsel wrote back with corrections, clarifying that the counteroffer was as follows:

> a. $170,000 per year annual distribution to [the Defendant] starting in 2021;
> b. [Identified real property will] remain in the Trust, a separate trust (perhaps), or some of other reasonably acceptable mechanism for the benefit of the remainder beneficiaries upon [the Defendant]'s death. The contents of the houses owned by the Decedent prior to his marriage remain within this provision. "Hard cost" (as previously defined) are paid from the Trust, subject to documentation a cap. "Soft costs" (as previously defined) are paid by [the Defendant];
> c. [The Defendant] has the right to sell the properties subject to restrictions (notice, marketing, listing, arms length transaction). [The

---

[33] *Id*. at p.12.

[34] *Id*. at p.16.

[35] *Id*. at p.19.

Defendant] will provide an independent appraisal from a licenses real estate appraiser and provide to the beneficiaries. If any party objects, they will provide an alternative appraisal from a licensed real estate appraiser in 30 days. The average of both (or all if more than one beneficiary submits an appraisal in 30 days) will determine fair value). The proceeds from the sale will go into the Trust. The Trust will purchase a replacement property for [the Defendant] of [the Defendant]'s choosing, in line with point #2 (below) with a cap of $800,000.00;

d. Distribution Advisor is Dave Miller;

e. Medical-- Distributions are to be made by a Distribution Advisor for medical expenses in the future to the extent [the Defendant]'s other personal assets or medical benefits will be considered by the Distribution Advisor when making the decision as to any additional disbursement for medical expenses.

f. Make up distribution of a total of $200,000 for the years 2019 and 2020. [36]

Regarding the referenced trust, the Defendant's counteroffer specified:

1. Keep Trustee and successor Trustees as identified currently.

2. Annual Accountings (similar to current form).

3. Joint Accounts as identified on the inventory are [the Defendant]'s to do as she sees fit.

4. All terms herein are subject to a reasonable and acceptable mechanism to effect them and to the extent any provisions in the 2015 Trust document are contrary to the intent or intended effect of these provisions, then they will be remedied.

5. Full releases, including [the Defendant]'s Estate.

6. Cases dismissed with prejudice.

7. NO legal Fees. However, [the Defendant] may elect to give each beneficiary $35K and [the Plaintiff] can request contribution from the others as to [the Plaintiff]'s legal fees.

8. Power of Appointment stays (or will be made) available to [the Plaintiff].

---

[36] *Id*. at p.23-24 (alterations removed).

9. Upon [the Defendant]'s passing, trust terminates and distributes.[37]

Within a week, on March 2, 2021, the Plaintiff's counsel responded that the clarified counter-offer was acceptable to his client and that she agreed to the terms.[38] The Plaintiff's counsel explained he would move forward to get beneficiary consent and continue to work with the Defendant's counsel "as to a structure going forward so [they could] draft the relevant documents and hammer out the details."[39] The Defendant's counsel responded in kind, offering to approach one of the next of kin and explaining the Defendant was in the hospital but there was a power of attorney who could sign on the Defendant's behalf "if we need to have it signed prior to her ability to do so."[40]

After March 2021, the Parties started to memorialize their agreement. They split responsibility with counsel for the Defendant drafting the trust documents and counsel for the Plaintiff drafting a nonjudicial settlement agreement.[41] After some back and forth, counsel for the Plaintiff collected the drafts and various edits and emailed counsel for the Defendant on September 3, 2021, inviting further discussion

---

[37] *Id.* (alternations removed).

[38] *Id*. at p.26.

[39] *Id.*

[40] *Id*. at p.30.

[41] *Id*. at p.36.

and identifying what he saw as the biggest disconnect.[42]  Counsel for the Defendant responded raising a concern that some items in the drafted documents went "outside of what was determined" at mediation and noted: those items "need to come out but we are almost there otherwise."[43]

While the Parties were negotiating, my November 9, 2021 request for a status update hit the docket.[44]  The Parties agreed to a joint letter that provided: "This matter was mediated, successfully, over several days earlier this year. A settlement was reached in principle. However, in documenting this settlement, which contemplates both a proposed Irrevocable Trust and Nonjudicial Settlement Agreement, certain disputes have arisen as to the actual terms of the settlement."[45] After the letter was filed, the Parties got back to work.

The Parties continued negotiating through the end of 2021, into 2022.  On December 16, 2021, the Plaintiff's counsel collected all revisions and provided his client's assent and rejection of various alterations in the draft nonjudicial settlement agreement and trust.[46]  The Plaintiff's counsel explained (1) the Plaintiff accepted

---

[42] *Id*. at p.26.

[43] *Id*. at p.35.

[44] D.I. 16.

[45] D.I. 17.

[46] JX 8.

the Defendant's changes to the trust, except for one provision and (2) the Plaintiff accepted some but not all of the Defendant's changes to the nonjudicial settlement agreement and proposed alternative language.[47] The Plaintiff's counsel attached documents clarifying the revisions, alterations, and rejections.[48]

In response, on January 7, 2022, the Defendant's counsel confirmed that the Defendant accepted all the Plaintiff's changes.[49] With that acceptance, though, the Defendant asked for additional changes; if accepted, counsel noted: "We trust this will resolve the settlement agreement. Please have your client review, and if approved, we can have both parties execute and wrap this up."[50] Through a January 27, 2022 email, the Plaintiff accepted those additional changes, with one exception.[51] Assuming the Defendant would withdraw the final issue in dispute, the Plaintiff provided the Defendant with a proposed final drafts.[52] On January 28, 2022, the Defendant's counsel responded that there was "verbal agreement from [the

---

[47] *Id.*

[48] *Id.*

[49] *Id.*

[50] *Id.*

[51] JX 9.

[52] *Id.* at Ex. A-B.

Defendant], however, she needs to physically review and sign."[53]  Thereafter, the Parties submitted a joint letter with the Court explaining "the [P]arties have reached a complete resolution of this matter.  It has been documented and is in the process of being signed."[54]

But the draft agreement was never signed.  On February 18, 2022, counsel for the Plaintiff wrote to counsel for the Defendant asking for the Defendant's signed copy of the agreement so that the Plaintiff could "sign, as well."[55]  By May 2022, it became clear the remaining beneficiaries would not consent to the proposed agreement.  Thus, the Plaintiff's counsel proposed a joint motion to seek court approval of the proposed agreement, amended to remove "all references to the Nonjudicial and the relevant statutes"; the settlement trust would need to be amended similarly.[56]  The Plaintiff's counsel sent proposed final drafts to the Defendant's counsel on May 27, 2022.[57]  Sometime thereafter, though, the Defendant communicated that she would not sign.  The Plaintiff now seeks approval and

---

[53] JX 10, p.1.

[54] D.I. 19.

[55] JX 12.

[56] JX 14.

[57] JX 16.

enforcement of the final drafts (the "Settlement Agreement" and the "Settlement Trust").[58]

## II.    ANALYSIS

"Delaware law favors the voluntary settlement of contested suits, and such arrangements will bind the parties where they agree to all material terms and intend to be bound by that contract, whether or not the contract is made in the presence of the court, and even in the absence of a writing."[59] The party seeking enforcement—here, the Plaintiff—"bears the burden of proving the existence and terms of the agreement by a preponderance of the evidence."[60] This means the Plaintiff must prove that it is "more likely than not" that the parties entered into a contract on the specific terms reflected in the Settlement Agreement and the Settlement Trust.[61]

---

[58] JX 1-2.

[59] *Schwartz v. Chase*, 2010 WL 2601608, at *4 (Del. Ch. June 29, 2010) (cleaned up) (citing *Clark v. Ryan*, 1992 WL 163443, at *5 (Del. Ch. June 17, 1992)).

[60] *Exam Works, Inc. v. DeStefano*, 2014 WL 4804790, at *1 (Del. Ch. Sept. 26, 2014).

[61] *Delaware Exp. Shuttle, Inc. v. Older*, 2002 WL 31458243, at *17 (Del. Ch. Oct. 23, 2002) (quotations omitted).

The Defendant does not appear to contest any specific provisions in the Settlement Trust as being outside the scope of the settlement reached at mediation. She does, however, argue that certain provisions of the Settlement Trust conflict, or are inconsistent, with the Settlement Agreement. Tr. 45:15-47:16. I will discuss these purported inconsistencies when considering whether the Settlement Agreement and the Settlement Trust should be approved.

The Defendant agrees that specific terms were agreed to by the Parties. But she argues: (1) the Settlement Agreement failed to properly reflect the Parties' agreement at mediation; (2) the Parties did not have an enforceable agreement until execution of the written documents; or (3) the Defendant expressly conditioned her approval on signing the written agreement and cannot be bound without a signature. I find these arguments unavailing; the Defendant should be held to her agreement. I further find the agreement reflected in the Settlement Agreement and Settlement Trust should be enforced and bind all interested parties.

### A. The Parties reached a binding agreement on all material terms at mediation.

The Parties agree that they reached an agreement in principle at the conclusion of mediation. But, as with many deals, there were some intricacies to work out. The existence of metaphorical loose ends does not, however, mean that no deal was reached. Rather, this Court asks:

> Whether a reasonable negotiator in the position of one asserting the existence of a contract would have concluded, in that setting, that the agreement reached constituted agreement on all of the terms that the parties themselves regarded as essential and thus that that agreement concluded the negotiations and formed a contract.[62]

---

[62] *Delphi Petroleum, Inc. v. Magellan Terminal Holdings, L.P.*, 2020 WL 1972857, at *5-6 (Del. Super. Apr. 23, 2020), *aff'd*, 251 A.3d 101 (Del. 2021).

"[A] settlement agreement is enforceable even if it leaves other matters to future negotiation, provided those other matters are not 'essential' terms."[63] What is or is not essential is context specific; this Court looks to "the relative importance and severability of the matter left to the future."[64]

Here the Parties reached a binding and enforceable agreement on March 2, 2021, when the Plaintiff accepted the Defendant's counteroffer. The Parties manifested their mutual assent to the terms and a reasonable negotiator would have concluded that the agreement reached was final and covered all essential terms.

> **B.      The Parties supplemental and revised their agreement with the terms reflected in the Settlement Agreement and Settlement Trust.**

But that was not the end—the Parties ran into new issues while they worked to memorialize their mediation agreement. This led, in the Defendant's view, to new and altered terms. Specifically, she calls out the addition of an attestation clause and listing price provision, a change in the language regarding payments to interested parties, and the lack of a provision expressly barring the Plaintiff from seeking attorneys' fees. The Defendant argues that these terms are unenforceable because

---

[63] *Harrison v. Dixon*, 2013 WL 4759681, at *3 (Del. Ch. Sept. 5, 2013) (citations omitted).

[64] *Asten, Inc. v. Wangner Sys. Corp.*, 1999 WL 803965, at *2 (Del. Ch. Sept. 23, 1999) (citations omitted).

they were not part of the mediation settlement. But, because these terms were offered and accepted, I find they bind the Defendant.

Starting with the basics, Delaware law requires an offer and an acceptance to form a contract. "Delaware, which has adopted the mirror-image rule, requires that acceptance be identical to the offer."[65] A purported acceptance that is not identical "constitutes a rejection of the original offer and a counteroffer."[66] When there is room for interpretation, "[t]he words and conduct of the response are to be interpreted in light of all the circumstances."[67]

Here, the Parties reached a binding agreement in March 2021 and continued to negotiate the memorialization of that agreement, and additional matters, until January 28, 2022. Throughout that period, the Parties made numerous offers and counteroffers, accepting and rejecting various provisions and working, incrementally, toward an agreeable resolution on all issues. The final counteroffer was made by the Plaintiff on January 27, 2022. It was accepted on January 28, 2022 and is accurately reflected in the Settlement Agreement and Settlement Trust.

---

[65] *Ramone v. Lang*, 2006 WL 4762877, at *10 (Del. Ch. Apr. 3, 2006).

[66] *PAMI-LEMB I Inc. v. EMB-NHC, L.L.C.*, 857 A.2d 998, 1015 (Del. Ch. 2004) (citations omitted).

[67] *Id.* (citations omitted).

### C. The Defendant's acceptance was not conditioned on execution.

To escape enforcement of the Settlement Agreement and Settlement Trust, the Defendant argues that her acceptance was conditional, and she was not bound unless and until she signed. She points to her prior counsel's email that there was "verbal agreement from [the Defendant], however, she needs to physically review and sign."[68] The Defendant attempts to bolster this argument by pointing to language in Settlement Agreement which provides "[t]his Agreement shall be effective as of the date the last of the signatories hereto executes this Agreement." I find this argument unavailing.

"Generally, when parties to a contract have agreed on all substantial terms of the contract and intend to be bound, the fact that one of the parties understood 'that the contract should be formally drawn up and put in writing [does] not leave the transaction incomplete . . . in the absence of a positive agreement that it should not be binding until so reduced in writing and formally executed.'"[69] Thus, the question before me is whether the Parties positively agreed that there will be no binding contract until execution, either by both sides or by the Defendant.

---

[68] JX 10, p.1.

[69] *Schwartz v. Chase*, 2010 WL 2601608, at *8 (citations omitted).

The balancing involved in this test was applied in *Transamerican S.S. Corp. v. Murphy*.[70] There, Chancellor Allen addressed whether a binding settlement agreement had been reached and should be specifically enforced over the defendants' objection. He ruled in favor of the defendants. "Although the parties had agreed to all of the substantive terms of their proposed contract and had concluded their substantive negotiations[,]" the defendants "had made it plain that they were not consenting to be bound by contract until a writing evidencing their agreement was executed."[71] Because this condition precedent was plainly and unequivocally communicated to the other side during negotiations, "a reasonable negotiator would have understood, that [the defendants] would not be bound until the agreements that had been reached were reduced to a writing that was executed."[72] Thus, no agreement was reached and the request to enforce was denied.

Similarly, in *Riblett v. Riblett*, this Court considered the enforceability of an unsigned settlement agreement which contained a clause stating "[if] a settlement is reached, the agreement shall be reduced to writing and when signed, shall be binding

---

[70] 1989 WL 12181 (Del. Ch. Feb. 14, 1989).

[71] *Id.* at *1.

[72] *Id.* at *2.

upon all parties to the agreement and become part of the court record."[73]  The Court

found that this express condition was not met, and that later verbal agreements did

not overcome the express requirement that the settlement agreement be signed.[74]

But "an observation that the parties manifested an intention that the settlement

agreement would be memorialized in writing," is a far cry from the positive

agreements in *Murphy* and *Riblett*.[75]  This distinction is evident in *Loppert v.*

*WindsorTech, Inc.*, where the defendant argued that "the parties intended for only a

signed writing to bind the parties" and pointed to letters from the other side

supporting continued litigation until the deal was "signed up."[76]  Chancellor

Chandler found this was insufficient to show a positive agreement.  While the parties

memorialized their agreement and "[u]ntil a dismissal, stay, or new scheduling order

was submitted to and granted by this Court, plaintiff had every right to expect

defendant to adhere to the existing scheduling order."[77]  Adherence to that schedule

---

[73] *Riblett v. Riblett*, 2018 WL 1352329, at *1 (Del. Ch. Mar. 15, 2018).

[74] *Id.* at *3.

[75] *Loppert v. WindsorTech, Inc.*, 865 A.2d 1282, 1288 (Del. Ch. 2004).

[76] *Id.* at 1287.

[77] *Id.*

was "not evidence that the parties positively agreed to be bound by a signed writing."[78]  A binding agreement had been reached, despite the lack of execution.[79]

This case is like *Loppert*, not *Murphy* or *Riblett*.  At no time during negotiations did the Defendant communicate that the agreements being reached would only be enforceable if memorialized and executed.  The only indication of such purported condition was in the final acceptance email from the Defendant's counsel that the Defendant accepted the terms verbally, and just needed to sign.  This communication is an unequivocal acceptance, and a courtesy explanation that a signed document is forthcoming; it is not an express condition precedent nor indicative of a positive agreement.  Similarly, the provision in the Settlement Agreement defining the effective date is not a condition precedent, because it does not create an additional requirement for enforceability.[80]  The Defendant

---

[78] *Id.*

[79] *Id.  Cf. Schwartz v. Chase*, 2010 WL 2601608, at *8 (finding positive agreement where "[n]ear the outset of negotiations, [one side] indicated to [the other] that [he] would not even consider whether to accept the terms of the Settlement Agreement until after [one party] had signed that document").  *See also Delphi*, 2020 WL 1972857, at *8 (finding a binding agreement despite one party's belated attempt to alter the terms).

[80] *See Ainslie v. Cantor Fitzgerald, L.P.*, 2023 WL 106924, at *10 (Del. Ch. Jan. 4, 2023) ("Whether the agreement establishes a condition is a question of intent to be drawn from the agreement's plain, unambiguous language. Words and phrases such as if, provided that, and on the condition that generally indicate the parties have created a condition.") (citations and quotation marks omitted).

unconditionally agreed to the final terms reflected in the Settlement Agreement and

Settlement Trust and the request to enforce those terms should be granted.

> **D.** **The Settlement Agreement and the Settlement Trust should be approved.**

Because the Settlement Agreement and Settlement Trust affect the rights of

non-party beneficiaries, the Plaintiff also asks for court approval, binding all

interested parties. To approve a settlement agreement, the Court must determine

"whether the agreement is fair and reasonable in view of the particular circumstances

at hand."[81]  The Court should consider factors including:

> (1) the delay, expense and trouble of litigation, (2) the amount of the settlement proposed as compared with the amount of a judgment, (3) the views of the parties involved, (4) the probable validity of the claims, (5) difficulties in enforcing the claims through the court, and (6) the collectability of any judgment.[82]

The Court considered these factors in *Clark v. Ryan*, a partition action pending

before then-Vice Chancellor Chandler.[83]  There, much like this case, the parties had

been working diligently toward a settlement, but one side had second thoughts and

opposed a motion to enforce and approve the agreement reached. The Court found

---

[81] *Clark*, 1992 WL 163443, at \*7 (citing *In re Ortiz' Est.,* 27 A.2d 368, 374 (Del. Ch. 1942)).

[82] *Id.*

[83] *Id.*

the agreement was binding and, more so, was fair, given the protracted nature of the litigation, the reasonable "give and take" in settlement negotiations, and Delaware's policy in favor of settlement.[84]  Then-Vice Chancellor Chandler emphasized the benefit of this policy in family controversies, stating:

> It may be wishful thinking to believe that much in the way of family harmony remains in this particular family, but little purpose would be served by rejecting what appears to be a reasonable settlement and forcing the parties to continue this fight within the family until their last breaths on this earth.[85]

Like the resolution in *Clark*, the Settlement Agreement and Settlement Trust are a reasonable outcome following protracted settlement negotiations.  The Parties went to great lengths over several years to come to terms that were acceptable to all involved.  Both sides gave and took.   And despite notice and opportunity to do so, none of the interested parties have objected.

The only concerns raised were by the Defendant, who noted inconsistencies between the Settlement Agreement and the Settlement Trust.  The Defendant argues these inconsistencies may lead to further litigation.  She may well be correct.  But this Court does not require perfect, error-free drafting, nor will I second guess the

---

[84] *Id.*

[85] *Id.*

Parties' agreed upon resolution.[86] The Parties negotiated for years, addressing various issues big and small; I find it equitable to defer to their agreed upon drafts. I echo the sentiments of Chancellor Chandler that this conclusion will hopefully serve to relieve some of the ongoing strife within the Decedent's family. The Settlement Agreement and Settlement Trust should be approved.

## III.  CONCLUSION

For the above reasons, I find that the Motion should be granted. The Settlement Agreement and Settlement Trust should be approved and enforced. These documents reflect the Parties' final resolutions after years of negotiating. The Defendant's last-minute attempt to back out of the deal painstakingly reached should be denied. Further, the remaining interested parties had notice and the opportunity to be heard regarding the deal and failed to file any opposition or appear at the scheduled hearing to speak in opposition. When considering the lengthy negotiations and comprises leading to the Settlement Agreement and the Settlement Trust, I find those documents should be approved and enforced.

---

[86] *See Nemec v. Shrader*, 991 A. 2d 1120, 1125 (Del. 2010) ("Parties have a right to enter into good and bad contracts, the law enforces both.").

This is my final report and exceptions may be filed under Court of Chancery

Rule 144.

Respectfully submitted,

/s/ *Selena E. Molina*

Master in Chancery