David A. LOPPERT, Plaintiff,

v.

WINDSORTECH, INC., a Delaware
corporation, Defendant.

Civil Action No. 441–N.

Court of Chancery of Delaware,
New Castle County.

Submitted: June 11, 2004.

Decided: June 25, 2004.

J. Travis Laster, of Richards, Layton & Finger, Wilmington, DE, for Plaintiff.

Vernon R. Proctor and Patricia L. Enerio, of The Bayard Firm, Wilmington, DE; Alan Burger and Andrew Trailor, of Burer Trailor & Farmer, West Palm Beach, FL, of counsel, for Defendant.

## OPINION

CHANDLER, Chancellor.

Plaintiff David Loppert moves for summary judgment. Loppert seeks to enforce a settlement agreement reached between him and defendant WindsorTech, Inc. For the reasons set forth below, I grant the motion.

## I. STANDARD

This Court may grant a motion for summary judgment if there is no genuine dispute as to the material facts and the moving party is entitled to judgment as a matter of law.[1]

## II. MATERIAL FACTS WITHOUT GENUINE DISPUTE

Loppert and WindsorTech are parties to an action in this Court brought by Loppert under 8 *Del. C.* § 220(d), captioned *Loppert v. WindsorTech, Inc.,* C.A. No. 394–N (the "220 Action"). Besides the 220 Action, the parties disagree on other issues related to Loppert's services on behalf of WindsorTech.

On Wednesday, May 5, 2004, Loppert's counsel, J. Travis Laster, sent WindsorTech's counsel, Alan Burger, a letter proposing terms for a potential settlement.[2] The letter contained fourteen points and stated: "We are not willing to put the [220 Action] on hold while we discuss settlement. Any discussions will need to proceed in parallel with the litigation."[3] Laster's May 5 letter also stated: "The settlement agreement will contain other customary and ordinary terms and provisions."[4] On May 6, the next day, Burger responded with several proposed changes.[5] Later that day, Laster replied and integrated many of Burger's proposed changes.[6]

On the afternoon of Friday, May 7, Burger responded to Laster's proposal from the previous day.[7] Burger raised a handful of issues.[8] Laster replied that WindsorTech's positions were "acceptable except on item 4," which referred to the number of WindsorTech options Loppert

---

1. Ch. Ct. R. 56(c); *Gilbert v. El Paso Co.,* 575 A.2d 1131, 1142 (Del.1990).

2. Affidavit of J. Travis Laster ("Laster Aff.") Ex. 1. The letter was sent by e-mail as was all other correspondence referred to in this Opinion. WindsorTech does not dispute the accuracy of the correspondence documenting the settlement negotiations. In fact, in its brief, "WindsorTech … adopts the Laster Affidavit pertaining to the exhibits as well as the exhibits themselves." Def.'s Answering Br. in Opp'n to Pls. Mot. for Summ. J. ("AB") at 8 n. 5. In defendant's brief, there is a sole reference to a phone conversation, but the brief reveals no details about the conversation. AB at 10 & n. 7.

3. Laster Aff. Ex. 1.

4. *Id.*

5. *Id.* Ex. 2.

6. *Id.* Ex. 3.

7. *Id.* Ex. 7. Earlier on May 7, Loppert and WindsorTech agreed to a scheduling stipulation in the 220 Action, which was filed with the Court. *Id.* Ex. 4. WindsorTech agreed to "answer, move or otherwise respond to the complaint by May 11, 2004." *Id.* The stipulation was entered by the Court on the afternoon of May 7. *Id.* Ex. 6.

8. *Id.* Ex. 7.

wanted.[9] After this exchange, the only issue between the parties was the number of options Loppert would receive.

Burger stated that WindsorTech would provide Loppert with 1.1 million options.[10] Laster attempted to increase that number, but was unsuccessful.[11] Laster ultimately informed Burger: "We have a deal at 1.1 million options at a strike price of $1.10. We will do the first draft of implementing documents."[12] Burger replied: "good— I'll let the company know—have a good weekend."[13] The next communication between the parties was on Monday, May 10, 2004, when Laster sent Burger a draft settlement agreement memorializing their negotiations.[14]

On Tuesday, May 11, Laster sent Burger draft exhibits for the settlement agreement and stated: "Since we have not yet signed up the deal, we will be expecting your answer [in the 220 Action] today."[15] Burger responded: "if I have to prepare a response, deal is off."[16] Laster replied: "We said from day one that settlement moved in parallel with litigation. It's in my letter. You agreed."[17] Burger ended the discussion by stating: "deal is off . . . response will be served today."[18] The instant litigation, seeking enforcement of the settlement agreement, ensued a few days later.

## III. ANALYSIS

■■■ "[A] settlement agreement is enforceable as a contract."[19] To determine whether a contract was formed, the parties' "overt manifestation of assent—not subjective intent—controls" the result.[20] The inquiry is framed as follows:

> [W]hether a reasonable negotiator in the position of one asserting the existence of a contract would have concluded, in that setting, that the agreement reached constituted agreement on all of the terms that the parties themselves regarded as essential and thus that that agreement concluded the negotiations . . ."[21]

After a series of e-mail exchanges devoted to the sole remaining issue, the number of options Loppert would receive, Laster informed Burger that "[w]e have a deal at 1.1 million options."[22] Burger's response was "good—I'll let the company know."[23] In my opinion, any reasonable negotiator would have concluded that when the parties reached agreement on the number of

9. *Id.* Ex. 8.

10. *Id.* Ex. 9.

11. *Id.* Ex. 10.

12. Laster Aff. Ex. 10.

13. *Id.*

14. *Id.* Ex. 11.

15. *Id.* Ex. 12.

16. *Id.* Ex. 13.

17. *Id.*

18. *Id.* Ex. 14.

19. *Heiman Aber & Goldlust v. Ingram,* 1998 WL 442691, at *2 (Del.Super. May 14, 1998).

20. *Indus. Am., Inc. v. Fulton Indus., Inc.,* 285 A.2d 412, 415 (Del.1971) (citations omitted). *See also Diamond Elec., Inc. v. Delaware Solid Waste Auth.,* 1999 WL 160161, at *3 (Del.Ch. Mar. 15, 1999) ("the test for whether a contract has been formed is an objective one"); *Leeds v. First Allied Conn. Corp.,* 521 A.2d 1095, 1097 (Del.Ch.1986) (same).

21. *Leeds,* 521 A.2d at 1097.

22. Laster Aff. Ex. 10.

23. *Id.* Exhibit 10 is a "string" e-mail memorializing the give and take resulting in a manifestation of assent on the only outstanding issue, the number of options.

options, the negotiation of the settlement agreement was concluded.[24]

Despite the objective facts recited above demonstrating that a contract was formed, WindsorTech has interposed a series of arguments in an effort to avoid enforcement of the contract that Burger negotiated on its behalf. I will address each argument individually.[25]

### A. Delaware Rule of Evidence 408

■ Defendant argues that plaintiff cannot rely on the evidence cited herein because doing so would violate Delaware Rule of Evidence 408. Rule 408 does not allow litigants "to prove liability" for a claim or its amount with "[e]vidence of conduct or statements made in compromise negotiations" regarding that claim. Rule 408 does allow parties to introduce such evidence "for another purpose." Here, plaintiff is not offering evidence of settlement negotiations to prove that defendant is liable in the 220 Action. Instead, plaintiff is proffering evidence of compromise to prove the compromise itself.

"One permissible use of compromise evidence that is universally acknowledged both in the case law and by treatise writers occurs in situations in which the compromise is itself the subject of the present action."[26] Delaware case law reflects this view.[27] Also, the underlying purpose of Rule 408, encouraging settlements, is furthered by admitting evidence of alleged settlement agreements. WindsorTech's position would allow lawyers to negotiate and reach agreement on settlements, violate them at will, and then exclude all evidence of the negotiations (effectively what is happening here). Permitting such an approach "would flout the policy of promoting compromises under the Rule."[28]

### B. Memorialization of the Agreement

Defendant argues that the parties intended for only a signed writing to bind the parties. Specifically, defendant points to Laster's original letter of May 5, outlining the terms of the proposed settlement, and Laster's e-mail of May 11, attaching the exhibits to the formal agreement. The May 5 letter states: "We are not willing to put the Delaware litigation on hold while we discuss settlement. Any discussions will need to proceed in parallel with the

---

24. This finding is buttressed by evidence that on two occasions following the May 7 exchange, Burger referred to the parties as having a "deal." See Laster Aff. Ex. 13 ("if I have to prepare a response, deal is off"); id. Ex. 14 ("Didn't hear from you—deal is off").

25. Although at times framed as disputes over material facts, defendant's arguments are really attempts to interpret the facts differently than does plaintiff, especially through affidavits containing self-serving revelations of subjective intent. Such argumentation will not prevent summary judgment where, as here, the test applied to determine if plaintiff is entitled to judgment is objective, based on "overt manifestations," and views those overt manifestations through the eyes of a "reasonable negotiator."

26. DAVID P. LEONARD, THE NEW WIGMORE—A TREATISE ON EVIDENCE § 3.8.1 at 406–07 (2002).

27. See, e.g., Williams Natural Gas Co. v. Amoco Prod. Co., 1991 WL 236919, at **1–2 (Del.Super.Nov. 8, 1991) (plaintiff brought suit regarding a settlement agreement and Rule 408 did not preclude evidence concerning the negotiations).

28. Starter Corp. v. Converse, Inc., 170 F.3d 286, 294 (2d Cir.1999). See also Catullo v. Metzner, 834 F.2d 1075, 1079 (1st Cir.1987) (reasoning that admission of evidence of settlement negotiations to prove the terms of a settlement agreement supports the public policy favoring compromise). Delaware Rule of Evidence 408 tracks Federal Rule of Evidence 408.

litigation."[29] The May 11 e-mail states: "Since we have not yet signed up the deal, we will also be expecting your answer today."[30] Defendant contends that these two statements demonstrate plaintiff's intention to not be bound before a formal written agreement was drafted and signed. Defendant is incorrect.

The law in Delaware on this issue is straightforward:

Where all the substantial terms of a contract have been agreed on, and there is nothing left for future settlement, the fact, alone, that it was the understanding that the contract should be formally drawn up and put in writing, did not leave the transaction incomplete and without binding force, in the absence of a *positive agreement* that it should not be binding until so reduced to writing and formally executed.[31]

As such, "[t]he question is whether the parties positively agree that there will be no binding contract until the formal document is executed."[32] Here, there is no evidence that the parties "positively"[33] agreed to be bound only by a formal document.

Plaintiff's request for continued adherence to this Court's scheduling order in the 220 Action is not evidence that the parties positively agreed to be bound by a signed writing. Until a dismissal, stay, or new scheduling order was submitted to *and granted* by this Court, plaintiff had every right to expect defendant to adhere to the existing scheduling order that required defendant's answer on May 11.[34] Included in the materials e-mailed by Laster to Burger on May 11 was a stipulation of dismissal. Once the stipulation of dismissal was filed and granted by the Court, progress of the 220 Action could cease. Before such time, however, the parties are bound to adhere to court orders. Simply put, the fact that the parties had "settled" the dispute underlying the 220 Action as a matter of contract law did not *automatically* terminate that action or nullify the scheduling order.[35] As such, Laster's expectation that defendant would file an answer on May 11 because the paperwork necessary to dismiss or stay the action had not been prepared by either party only reflected a procedural reality— not evidence of an intent to be bound only by a signed writing.[36]

29. Laster Aff. Ex. 1.

30. *Id.* Ex. 12.

31. *Universal Products Co. v. Emerson*, 179 A. 387, 394 (Del.1935) (citation and internal punctuation omitted) (emphasis added).

32. *Anchor Motor Freight v. Ciabattoni*, 716 A.2d 154, 156 (Del.1998).

33. "Positive" is defined as follows: "Laid down, enacted, or prescribed. Express or affirmative. Direct, absolute, explicit." *Id.* BLACK'S LAW DICTIONARY 1324 (4th ed. 1968). The fact that *Universal Products Co.*, 179 A. at 394, and *Anchor Motor Freight*, 716 A.2d at 156, use the term "positive" is not lost on the Court.

34. WindsorTech agreed on May 7, the same day the essential terms of the settlement were agreed upon, to answer the complaint in the 220 Action on May 11. Laster Aff. Exs. 4, 5, & 6.

35. The jurisprudence of other states reflects this notion. *See Patel v. Orma*, 190 A.D.2d 782, 593 N.Y.S.2d 851, 852 (N.Y.App.Div. 1993) ("an action is not automatically terminated merely because a settlement has been reached"); *Cameron v. Great Atlantic & Pac. Tea Co.*, 439 Pa. 374, 266 A.2d 715, 716–18 (1970) (suit still pending until pertinent court order is issued).

36. Burger's affidavit, Affidavit of Alan Burger ("Burger Aff.") ¶ 14, suggests that he requested a stay of the proceedings when he e-mailed Laster stating: "if I have to prepare a response, deal is off." Laster Aff. Ex. 13. This is revisionist history. A reasonable negotiator would interpret Burger's e-mail as demanding

■ Defendant's argument is really nothing more that an observation that the parties manifested an intention that the settlement agreement would be memorialized in writing—an observation that I share with defendant. Laster's May 5 settlement proposal stated that the ultimate settlement agreement would contain "customary and ordinary terms," indicating that Laster intended any agreement on the essential terms would eventually be reduce to writing and accompanied by the necessary implementation clauses.[37] This intention was borne out on May 7 when Laster informed Burger he would draft the "implementing documents"—documents sent promptly to Burger on May 10 and 11. But "the fact that the parties . . . manifest an intention to prepare and adopt a written memorial" will not prevent contract formation if the evidence reveals "[m]anifestations of assent that are in themselves sufficient to conclude a contract."[38]

## C. Board Approval

Defendant argues that it is not bound by the agreement reached on May 7 because the WindsorTech board never formally adopted the agreement. In support of this argument defendant points to (1) two clauses in the implementing documents sent by Laster to Burger on May 10 that refer to WindsorTech board approval[39] and (2) the affidavits of Burger and WindsorTech's president, Marc Sherman.[40] This evidence, however, does not create an issue of fact or allow WindsorTech to avoid the consequences of Laster and Burger's manifestation of assent to the settlement agreement on May 7.

■ The clauses in the formal document memorializing the May 7 agreement do not provide that board approval is a condition to the settlement that require satisfaction, but are stated as a representation that board approval already occurred. This is consistent with the legal principle that where "an attorney of record in a pending action acknowledges that a compromise has been reached, he or she is presumed to have the lawful authority to do so."[41] Quite simply, Burger was presumed to be acting under the authority of his client. This principle does not change because Burger's client is a corporation. "The authority of attorneys to bind a corporation is precisely the same as in the case of natural persons."[42] Sherman's affidavit states that he was aware that Burger was conducting negotiations on

---

a stay in exchange for his non-repudiation of the agreement, i.e., the "deal," reached on May 7, something Burger had no right to do.

37. Plaintiff's revised proposal of May 6 simply stated: "These terms will be memorialized in a settlement agreement." Laster Aff. Ex. 3.

38. RESTATEMENT (SECOND) OF CONTRACTS § 27 (1981).

39. Laster Aff. Ex. 11 at §§ 3.2(b), (f).

40. The affidavits indicate that Burger and Sherman held the subjective belief, not relevant under Delaware law, see supra note 20 and accompanying text, that the settlement agreement would be reduced to writing, approved by the board, and executed by an officer of the company. Burger Aff. ¶ 6; Affidavit of Marc Sherman ("Sherman Aff.") ¶ 6.

41. Rowe v. Rowe, 2002 WL 1271679, *3 (Del. Ch. May 28, 2002). See also Shields v. Keystone Congeneration Sys., Inc., 620 A.2d 1331, 1335 (Del.Super.1992), aff'd sub nom. Zencey v. Keystone Congeneration Sys., Inc., 1992 WL 696966 (Del. Apr. 10, 1992) (attorney engaging in settlement discussions presumed to have actual authority to conclude an agreement).

42. FLETCHER CYCLOPEDIA CORPORATIONS § 483, at 517 (1998).

WindsorTech's behalf.[43] And Burger's statements to Laster, such as "1.1 [million options] is all I have," [44] are objective evidence that he was preauthorized to commit WindsorTech to the essential terms reached on May 7.[45]

### D. Counterproposal

■■■ Although defendant does not raise this argument in its briefing, Burger and Sherman's affidavits state that Laster's May 10 e-mail, attaching the formal settlement agreement, contained different and additional terms to those discussed before the May 7 manifestation of assent on the essential terms.[46] The suggestion is that the May 10 draft agreement was actually a counterproposal. Obviously, the formal document was going to have additional, boilerplate terms, but there is no evidence that those terms were "essential." Moreover, there is no evidence that the essential terms agreed to on May 7 were contradicted by the May 10 memorialization.[47] A settlement agreement is enforceable if it contains all essential terms, even though it expressly leaves other matters for future negotiation.[48] Also, on May 11, Burger's objective rationale for repudiating the settlement agreement was not that it contained differing terms, but rather that WindsorTech was expected to adhere to the Court's scheduling order requiring

the submission of an answer.[49] Burger's contemporaneous conduct eviscerates his affidavit that suggests a new, subjective reason why he repudiated the settlement.

### E. Specific Performance

■■■ Defendant argues that Loppert is not entitled to specific performance because (1) he has an adequate remedy at law through continued litigation in the 220 Action and (2) the terms of Laster's May 5 settlement proposal contained a provision that provided an exclusive legal remedy. As to the latter contention, defendant refers to paragraph eleven of the May 5 settlement proposal:

> In the event of a default of the settlement agreement, all monetary sums due and owning [sic] under the agreement will become immediately due. A notice of breach will be required to be faxed to the non-breaching party and that party's counsel, and there would be a 10–day cure period prior to acceleration.[50]

The provision undoubtedly provides a remedy in the event of default, but "[a]n express provision for one remedy in case of breach is not operative as a 'waiver' of other remedies." [51] Also, any suggestion that Loppert should provide WindsorTech with a 10-day notice letter is quixotic—

---

43. Sherman Aff. ¶ 3.

44. Laster Aff. Ex. 10.

45. Also, the reference to board approval in the May 10 memorialization is the type of "customary and ordinary" clause referenced in plaintiff's May 5 settlement proposal.

46. Burger Aff. ¶ 13; Sherman Aff. ¶ 4.

47. And even if the memorialization did differ from the essential terms it would not have been a "counterproposal" because Laster and Burger had already agreed to those terms.

48. *Asten, Inc. v. Wangner Systems Corp.,* 1999 WL 803965, at **2–3 (Del.Ch. Sept.23, 1999);

RESTATEMENT (SECOND) OF CONTRACTS § 33(2) & cmt. a (1981). This Court has enforced settlement agreements for division of land where the dividing line was not specified. *Hendry v. Hendry,* 1998 WL 294009, at **2–3 (Del.Ch. June 3, 1998).

49. Laster Aff. Ex. 13 ("if I have to prepare a response, deal is off").

50. Laster Aff. Ex. 1.

51. CORBIN ON CONTRACTS § 1227 at 530 & n. 90 (1993).

defendant is presently contesting the validity of the agreement.

 Defendant's argument that continued litigation in the 220 Action provides Loppert with an adequate legal remedy misses the mark. The settlement reached by the parties is "global" and includes potential claims outside the narrow scope of a 220 Action, *i.e.*, continuing on with the 220 Action can only provide an incomplete and uncertain remedy. Release from liability, especially future liability, cannot be compensated for easily by money damages. The settlement agreement also provides for "mutual non-disparagement," a unique provision that also cannot be readily compensated for by money damages.[52] "Equity respects the freedom to contract, and dictates that both [parties to the settlement] should receive the benefit of their bargain through specific performance."[53]

### F. Timeliness of Plaintiff's Motion

 Defendant argues that plaintiff's summary judgment motion is premature and fails to comply with Court of Chancery Rule 56(a). Rule 56(a) allows a plaintiff to move for summary judgment "at any time after the expiration of 20 days from the commencement of the action." Although Loppert moved for summary judgment before the expiration of 20 days, in the circumstances of this case, Rule 56(a) does not prevent the Court from granting plaintiff's motion. Rule 56(a) does not, without exception, prohibit a plaintiff from moving for summary judgment before the expiration of 20 days from the commencement of an action. The Court may truncate the 20-day period when it is the opinion of the Court that doing so aids judicial efficiency without prejudicing the defendant.[54]

The Court made the determination to shorten the 20-day period at a pretrial scheduling conference held on May 27, 2004.[55] At that time, two factors compelled the Court to allow plaintiff to proceed with its motion despite the fact that it was premature under Rule 56(a). First, WindsorTech would endure no prejudice in its defense. The material facts were both limited and personally known by defendant's counsel—the evidence consisted of e-mail exchanges between opposing counsel over the course of only a few days.[56] Second, the 220 Action was proceeding at an expeditious pace because actions under 8 *Del. C.* § 220 are summary in nature. This Court stayed the 220 Action, which

---

52. Laster Aff. Ex. 1. The settlement agreement also contains other benefits for Loppert, including a new substantial equity position in WindsorTech, which are not susceptible to monetary relief. *Id.*

53. *Asten, Inc.*, 1999 WL 803965, at *6. "Delaware law favors the voluntary settlement of contested disputes." *Clark v. Ryan*, 1992 WL 163443, at *5 (Del.Ch. June 17, 1992). This public policy counsels in favor of granting specific performance.

54. This power stems from the inherent authority of the Court of Chancery to control its own docket. *See Belfint, Lyons & Shuman, P.A. v. Pevar*, 844 A.2d 991, 2004 WL 542083, at *2, 2004 Del. Lexis 127, at *7 (Del. Mar. 10, 2004) (acknowledging the inherent power

of the trial court to control its docket); *Taylor v. LSI Logic*, 715 A.2d 837, 842 (Del.1998) (same).

55. Despite the conference being held before the expiration of 20 days, defendant had already secured counsel at that time—the same counsel representing defendant in the 220 Action.

56. The limited factual issues are also due, in part, to the legal test for contract formation which relies on objective evidence rather than evidence of subjective intent. As such, unless defendant raised some factual dispute as to the objective evidence, no depositions were required. And ultimately, as described herein, the objective evidence was without material dispute.

was scheduled to go to trial in July, to allow the parties to promptly brief and the Court to promptly decide plaintiff's summary judgment motion. Prompt briefing and decision on the summary judgment motion was, in the Court's view, the most efficient and economical manner to attempt to resolve *both* the 220 Action and the instant proceeding.

I remain committed to the decision made at the May 27 scheduling conference. Defendant has had "a reasonable opportunity to present all facts pertinent to the motion." [57]

## IV. ATTORNEYS' FEES

 The settlement proposal Laster sent to Burger on May 5 provides: "The prevailing party will be entitled to costs (including attorneys' fees) for the enforcement of the settlement." [58] Burger's response to the May 5 proposal was "[a]ll acceptable except as follows...." [59] Although Burger objected, among other things, to the provision reimbursing Loppert for his fees and expenses incurred in the 220 Action, he made no mention of the separate provision relating to reimbursement of fees and expenses to enforce the settlement agreement related to the 220 Action. [60] Plaintiff's revised settlement proposal of May 6 retained the provision

entitling Loppert to reimbursement of fees and expenses to enforce the settlement agreement. [61] Burger again made a handful of counterproposals, but none related to reimbursement of fees and expenses to enforce the settlement agreement. [62] As described earlier, the negotiations were eventually narrowed to a single issue, the number of options. All other essential terms were agreed upon. Once the final piece of the puzzle was the subject of mutual assent, a contract was formed. One of the essential terms of that contract is as follows: "The prevailing party will be entitled to costs (including attorneys' fees) for the enforcement of the settlement." [63]

Defendant has one "simple answer" to counter the above conclusion: "no contract was formed." [64] Unfortunately, the simple answer is not always correct. A contract was formed *and* it includes a provision entitling the prevailing party, in this case Loppert, to costs (including attorneys' fees) for the enforcement of the settlement.

## V. CONCLUSION

The communications between the parties establish a binding and enforceable settlement agreement as a matter of law. The parties mutually assented to the essential terms of the settlement agreement on May

---

57. *Mann v. Oppenheimer & Co.*, 517 A.2d 1056, 1060 (Del.1986). Defendant did not argue in its answering brief, filed over two weeks after plaintiff's motion was submitted, that it was in any way prejudiced by the accelerated briefing schedule. I opine on this issue because it was raised in a sur-reply letter filed by defendant (without the Court's permission).

58. Laster Aff. Ex. 1.

59. *Id.* Ex. 2.

60. *Id.* Burger referred to specific paragraph numbers, making it clear which provisions were and were not acceptable. *Id.*

61. *Id.* Ex. 3.

62. *Id.* Ex. 7. Again, Burger referred to specific paragraph numbers. *Id.*

63. Laster Aff. Exs. 1 (original proposal), 2 (revised proposal), & 10 (manifestation of mutual assent to all essential terms).

64. AB at 26.

7, 2004. Further, because a breach of the settlement agreement is not readily remedied by monetary damages, Loppert is entitled to specific enforcement of the agreement's essential terms. Plaintiff shall submit an affidavit detailing his costs for the enforcement of the settlement within ten days from the date of this Opinion.

IT IS SO ORDERED.