# IN THE SUPREME COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| STEPHANIE P. SHILLING,[1] | § | |
| | § | No. 66, 2024 |
| Petitioner Below, | § | |
| Appellant, | § | Court Below: Family Court |
| | § | of the State of Delaware |
| v. | § | |
| | § | File No. CN15-03650 |
| EBON T. SHILLING, | § | Petition No. 23-06331 |
| | § | |
| Respondent Below, | § | |
| Appellee | § | |

Submitted: September 11, 2024
Decided: December 4, 2024

Before **TRAYNOR, LEGROW** and **GRIFFITHS,** Justices.

Upon appeal from the Family Court of the State of Delaware. **REVERSED AND REMANDED.**

Kara M. Swasey, Esquire, BAYARD, P.A., Wilmington, Delaware, *for Appellant Stephanie P. Shilling*.

Jennifer A. Hartnett, Esquire, HARTNETT & HARTNETT, Hockessin, Delaware, *for Appellee Ebon T. Shilling*.

---

[1] The Court assigned pseudonyms to the parties pursuant to Supreme Court Rule 7(d).

**TRAYNOR**, Justice:

This case concerns an ex-wife's failed effort to enforce an agreement that she believed she had reached with her ex-husband respecting the sale of her interest in certain property acquired by the parties during their marriage. The record shows that, in an exchange of email messages, the ex-husband offered to purchase the interest, and the ex-wife accepted the offer. But the Family Court found that the offer and acceptance did not result in an enforceable contract because the parties had not adequately manifested their intent to be bound by what they said in the email exchanges and that the exchanges did not contain all the contractual terms that were material to the parties. In consequence of these findings, the Family Court declined to enforce the putative agreement.

We view the matter differently. As we see it, the Family Court overlooked the most relevant evidence of the parties' intent and the terms they deemed material to the sale of the ex-wife's interest in the subject property. And this oversight led the court to the erroneous conclusion that the parties' communications did not form an enforceable contract. We therefore reverse the Family Court's judgment and remand the matter so that the court can consider what relief is appropriate in light of our determination that the parties' email exchanges gave rise to an enforceable contract.

I

A

When Stephanie P. Shilling ("Wife") and Ebon T. Shilling ("Husband") divorced in April 2016, they owned interests in three commercial buildings—one in Seaford, one in Smyrna, and one in Dover. In a November 3, 2017 letter decision and order resolving matters ancillary to the parties' divorce (the "Ancillary Order"), the Family Court ordered Husband and Wife to sell their interests in the three commercial properties and split the proceeds from each sale; Wife would receive 55 percent of the proceeds, and Husband would receive the remaining 45 percent. Until the interests in the three properties were sold, Wife would receive 55 percent of any income generated from the properties, and Husband would receive the remaining 45 percent.

Shortly after the Family Court issued the Ancillary Order, the parties agreed to exchange their interests in the Seaford and Smyrna properties; Wife became the sole owner of the Seaford Property and Husband became the sole owner of the Smyrna Property. This resulted in Husband and Wife only sharing an interest in the Dover Property. Selling their interest in that property, however, proved to be more complicated.

Husband and Wife did not directly own the Dover Property. Instead, the Dover Property was held by a Delaware limited liability company (the "LLC"). At

3

the time of the parties' divorce, Husband owned a 50 percent interest in the LLC with two other members, each of whom owned a 25 percent interest. This created two obstacles for Husband and Wife. First, to sell the Dover Property, Husband needed the consent of the other LLC members, and neither of them consented to a sale. Second, the members of the LLC were required by the LLC's operating agreement to rent office space in the Dover Property. Accordingly, Husband's medical practice operated out of the Dover Property. So to sell his interest, Husband would either need to find a buyer who did not plan to use the space and would allow Husband to stay as a tenant or uproot his medical practice. Consequently, it was not feasible for Husband to sell the Dover Property as a whole or to sell his interest in the LLC. Because a sale was not immediately possible, Wife continued to receive 55 percent of the income generated from the parties' interest in the Dover Property under the Ancillary Order.

In 2019, a dispute arose between Husband and Wife regarding the income generated from the Dover Property. The Family Court entered a Stipulation and Order Resolving Petition Rule to Show Cause (the "Stipulated Order") requiring that Husband pay Wife 55 percent of the taxable income from the Dover Property reported on Husband's Schedule K-1 (the "K-1 Payments").

B

In May 2021, one of the two other LLC members announced that he was retiring, which rekindled discussions about selling the Dover Property. In November 2021, Husband informed Wife that he and the remaining LLC member had listed the Dover Property for sale and had received a $2.2 million offer. In January 2022, Husband emailed Wife an update on the sale of the Dover Property. In that same email, Husband also told Wife, "I would be potentially willing to buy your shares as well. I am not sure if you would now have to pay taxes on this[.]"[2]

As far as we know, the issue lay dormant for several months. But in August 2022, discussions resumed and appeared to have culminated in a resolution. On August 3, Husband sent Wife another email, this time informing her that he and the other remaining LLC member had agreed to purchase the retiring member's interest in the Dover Property. In that same email, Husband wrote:

> I assume that you are not interested in selling your ownership stake in the building and we will keep things the same. If you are interested let me know. Your share would be valued at $605,000. I could write a check for this. So let me know your thoughts.[3]

---

[2] App. to Opening Br. at A94.
[3] *Id.* at A65. *See also id.* at A7–8. The value of Wife's share reflected Husband's 50 percent interest in the LLC, the approximate value of the Dover Property ($2.2 million), and the Wife's right under the Ancillary Order to receive 55 percent the sale price of the parties' interest in the Dover Property ($2.2 million x 50% x 55% = $605,000).

5

Two days later, Husband sent Wife a follow-up email reiterating his offer to buy Wife's interest in the Dover Property. Husband told Wife:

> I am again asking you if you would like to sell your shares of the building for a similar price. I can write you a personal check for the $605,000 that [I] can pay you immediately if [i]nterested. . . . I will assume if you don't respond by [A]ugust 31, 2022 that you are not interested and we will keep things the way they are.[4]

On August 24, 2022, Wife emailed Husband back. Wife wrote, "I will agree to sell my interest in [the Dover Property][5] to you for $605,000. Please let me know how you would like to proceed."[6] Husband responded via email the next day, stating, ". . . I spoke to the attorney. There really is not much to do except for you to sign a release and for me to give you a check."[7] Additionally, Husband gave Wife two options for the sale. Husband said that they could conduct the sale by the end of September 2022 for $586,643.20 or they could conduct the sale in May 2023 for $605,000.00.[8] Specifically, Husband said, "So if you are ok with me giving you a

---

[4] *Id.* at A66.

[5] Wife referred to the name of the LLC in this email, and the Court has redacted the name of the LLC to preserve the parties' anonymity. The parties sometimes referred to the Dover Property by the name of the LLC that owned the building. *See* Opening Br. Ex. A at 9 [hereinafter Opinion] ("While the LLC owns the commercial property, and during the ancillary hearing the asset was sometimes referred to as the Dover Commercial Property and sometimes [by the name of the LLC] . . . .").

[6] App. to Opening Br. at A68.

[7] *Id.* at A69.

[8] *See id.* Husband requested an adjustment to the initial offer price of $605,000 to account for advance K-1 Payments he had made to Wife under the Stipulation Order. Husband had already made K-1 Payments to Wife for May 2022 through April 2023. If the Sale occurred at the end of September, Husband would have already paid Wife $18,356.80 for seven months in K-1 Payments that he was no longer required to make. Therefore, Husband offered to pay Wife $585,643.20 ($605,000 - $18,356.80), rather than Wife having to return a portion of the advance K-1 Payments.

check for . . . **$586,643.20** by the end of September and you sign a release at the time of receipt of the check, I am good."[9]

On August 27, 2022, Husband sent Wife a follow-up email asking for her preference as to which of the sale options—the September 2022 or the May 2023—she was interested in. Husband told Wife, "If I don't hear back from you by Tuesday after Labor Day I will assume you are not interested."[10] That same day, Wife emailed Husband back, writing, "I accept your calculation and want to do it as of Sept 30, 2022."[11] Less than half an hour later, Husband replied, "Yes. We can do that."[12]

Three days later, in the same email chain, Husband emailed Wife about his purchasing of her interest in the Dover Property (the "Sale"). Husband wrote, "As per our recent communication, we have agreed that I will write you a personal check for $586,643.20 in exchange for a release of all remaining residual interest in [the Dover Property]."[13] Husband also told Wife that his lawyer was "going to prepare the paperwork for [them]."[14]

---

[9] *Id.* (emphasis in original).
[10] *Id.* at A71.
[11] *Id.* at A72.
[12] *Id.* at A73.
[13] *Id.* at A75. In this email, Husband called the property by the name of the LLC. The Court has redacted the name of the LLC to preserve the parties' anonymity.
[14] *Id.*

## C

As of September 21, nine days before the Sale was to occur, Husband had not yet sent Wife any "paperwork" from his lawyer. Wife sent Husband an email asking for the paperwork so that her attorney could review it. In the same email, Wife stated that if she does not "receive [the paperwork] in enough time that allows for review, the buyout date will have to be pushed back to next month."[15] Husband emailed Wife back the same day, and expressed reservations about the Sale. Husband wrote: "I am not 100 percent sure I want to do this now with the way the real estate market is and the stock market vs. just keeping the cash and putting it in the stock market in the near future."[16] Despite his second thoughts, Husband said that he would check with his lawyer and send the paperwork for Wife's review.

On September 27, just three days before the Sale was to occur, Husband emailed Wife again. He told Wife that there was "risk going forward" with the Sale, and that he could "earn almost the same amount of money [investing in bonds] and not pay taxes."[17] Husband ended the email, writing ". . . all things considered, I have no interest in pursuing the [Sale] at this time. I would do it for $500,000 cash but nothing less."[18] Wife did not respond to this email.

---

[15] *Id.* at A77.
[16] *Id.*
[17] *Id.* at A79.
[18] *Id.*

8

The day before the Sale was set to occur, Husband finally emailed Wife the paperwork that his lawyer had prepared. Despite his reservations only days before, Husband wrote in the email: "All things considered, this is the best way for us to move forward. . . . Given the amount of money, I would like to sign the paperwork at [my lawyer]'s office one day and get it notarized etc."[19] Attached to the email was a Stipulation of Satisfaction (the "Settlement Stipulation").[20] The Settlement Stipulation stated that "the parties have negotiated a buyout of Wife's interest[] in the Dover Commercial Property/[the LLC] including all interest, rights or entitlements to rental income or other benefits of ownership."[21] When it came to the price of the Sale, however, the Settlement Stipulation was blank; it merely stated that "[Husband] shall pay [Wife] the sum of _____ as a final buyout of [Wife]'s interest" in the Dover Property.[22] Husband emailed Wife about an hour later, stating, "Not sure [the previous email] went through. Here it is again. Let me know how you wish to proceed."[23] Attached to this follow-up email was another copy of the Settlement Stipulation that included a price of $586,643.20.[24]

On October 3, 2022, Wife's attorney emailed Husband about the Settlement Stipulation. After reviewing the Settlement Stipulation, Wife's attorney proposed

---

[19] *Id.* at A80.
[20] *Id.* at A81–82.
[21] *Id.* at 81.
[22] *Id.* at A82.
[23] *Id.* at A83.
[24] *Id.* at A85–86.

three changes to it: (1) an adjustment to the buy-out price to account for the advance K-1 Payments as the initial price contemplated a September closing date; (2) clarification that Wife's interest was in the Dover Property, not in the LLC; and (3) an adjustment to the provision stating that Husband would receive all rental income, adding that Husband would also be responsible for all obligations of the Dover Property.[25] Neither Husband nor his attorney responded to Wife's proposed changes to the Settlement Stipulation.

Throughout October, November, and December 2022, Husband, Wife, and their attorneys emailed back and forth about the Sale. Husband refused to move forward with the Sale unless Wife agreed to add to the Settlement Stipulation a provision addressing tax implications of the Sale. Wife refused to do so, stating that tax consequences were not part of, or relevant to, their agreement, and that tax implications could be dealt with by each party how they wished. Despite these complications, Wife was still interested in pursuing the Sale based on the initial $605,000 offer. Husband refused to proceed, however, until the parties included a provision about taxes in the Settlement Stipulation.

---

[25] *See id.* at A87, A90–92. The second and third changes that Wife's attorney made were to clarify that Wife had never been a member of the LLC, had no interest in the LLC, and therefore was not responsible for any pre-existing debts or liabilities of the LLC.

10

D

On March 24, 2023, Wife petitioned the Family Court for specific performance of the agreement that the parties had apparently struck in the waning days of August 2022. Specifically, Wife requested that the Family Court require Husband to pay Wife $605,000 for her ownership interest in the Dover Property, alleging that the parties' email correspondence contained "all of the essential terms of a contract," which the court should enforce.[26] In the alternative, Wife's petition sought a modification of the Ancillary Order to require Husband to buy out Wife's marital interest at the price agreed upon in their email correspondence. The Family Court disagreed and denied both Wife's claim for specific performance and for modification of the Ancillary Order.

The Family Court denied Wife's claim for specific performance because the court found that no contract had been formed. The court gave three reasons why the email messages between Husband and Wife did not, in its opinion, create a valid and enforceable contract. First, the Family Court found that there was no meeting of the minds between Husband and Wife regarding the Sale. In particular, the court found that the email messages did not contain all material terms and that the parties did not intend for the email messages to bind them. Second, the Family Court found that "[e]ven if the parties included all the essential terms and intended to be bound by the

---

[26] *Id.* at A37.

contract, signing the [Settlement Stipulation] was a condition precedent to the legal obligation to perform under this agreement"[27] Third, the Family Court concluded that, even if there was a contract, it was repudiated by Husband, and Wife acquiesced in Husband's repudiation by continuing to negotiate. The court also denied Wife's request for modification of the Ancillary Order because it was a consent judgment that was neither the product of a mutual mistake nor subject to such extraordinary circumstances as would warrant the requested relief. Wife now appeals the Family Court's denial of her Petition for Specific Performance, challenging each of these three conclusions, as well as the court's decision not to modify the Ancillary Order.

## II

## A

Whether a contract has been formed is a mixed question of law and fact.[28] Whether a party intended to be bound by a contract is a question of fact,[29] and we determine what terms are material to a contract "on a case-by-case basis."[30] A trial court's application of an equitable defense, such as acquiescence, also presents a

---

[27] Opinion at 11.
[28] *Tigani v. Fisher Dev. Co.*, 2022 WL 1039969, at *2 (Del. Super. Ct. Apr. 6, 2022), *aff'g* 2021 WL 1346526 (Del. Com. Pl. Apr. 9, 2021). *See also Eagle Force Hldgs., LLC v. Campbell*, 187 A.3d 1209, 1229–1232 (Del. 2018) ("*Eagle Force I*") (stating that the first element of contract formation—intent to be bound—is an "issue of fact," whereas the second element of contract formation—definiteness of the material terms—is "mostly . . . a question of law.").
[29] *See Eagle Force Hldgs., LLC v. Campbell*, 235 A.3d 727, 735 (Del. 2020) ("*Eagle Force II*") ("Whether a party manifested an intent to be bound is a question of fact.").
[30] *See Eagle Force I*, 187 A.3d at 1230.

12

mixed question of law and fact.[31] We review the Family Court's "factual determinations for clear error and its legal rulings *de novo*."[32] In our analysis, "we conduct a limited review of the factual findings of the Family Court to assure that they are supported by the record and are not clearly erroneous."[33]

B

"A valid contract requires an offer, acceptance, and consideration, and the parties must have intended that the contract would bind them."[34] Additionally, a "contract must contain all material terms in order to be enforceable,"[35] and those terms must be sufficiently definite.[36]

Here, it cannot be seriously disputed that Husband offered to purchase Wife's interest at a specified price and that Wife communicated her unequivocal acceptance

---

[31] *See Klaassen v. Allegro Dev. Corp.*, 106 A.3d 1035, 1043 (Del. 2014) ("A trial court's application of equitable defense presents a mixed question of law and fact."); *Julin v. Julin,* 787 A.2d 82, 84 (Del. 2001) ("Acquiescence is an equitable defense . . . .").

[32] *Eagle Force I*, 187 A.3d at 1228 (citing *Osborn ex rel. Osborn v. Kemp*, 991 A.2d 1153, 1158 (Del. 2010)).

[33] *Stewart v. Stewart*, 41 A.3d 401, 404 (Del. 2012).

[34] *Trexler v. Billingsley*, 166 A.3d 101, 2017 WL 2665059, at *3 (Del. 2017) (TABLE) (citing *Osborn*, 991 A.2d at 1158). In this case, Husband did not contend, nor did the Family Court find, that there was no agreement because of the absence of consideration. Even so and for completeness, we note that, where a contract is executory—that is, when the acts contemplated by the contract remain unperformed, such as when one party agrees to sell and the other to buy land— "the promises of each party supply the consideration necessary to support the contract." *See Wolf v. Crosby*, 377 A.2d 22, 27 (Del. Ch. 1977) (citing *Mobil Oil Corp. v. Wroten*, 303 A.2d 698, 701 (Del. Ch. 1973), *aff'd*, 315 A.2d 728 (Del. 1973)).

[35] *Osborn,* 991 A.2d at 1159 (quoting *Ramone v. Lang*, 2006 WL 905347, at *10 (Del. Ch. Apr. 3, 2006)). *See also Eagle Force I*, 187 A.3d at 1229 (citing *Osborn*, 991 A.2d at 1158.) ("[T]he parties intended that the instrument would bind them, demonstrated at least in part by its inclusion of all material terms.").

[36] *See Eagle Force I*, 187 A.3d at 1229 (citing *Osborn,* 991 A.2d at 1158–59).

13

of that offer. Indeed, in his August 5 email message to Wife, Husband described his proposal as "a fair and reasonable *offer*."[37] To keep discussions on track, Husband gave Wife a deadline to respond to his offer. Before that deadline, on August 24, Wife replied, "I will agree to sell my interest in [the Dover Property] to you for $605,000."[38] Had the email correspondence ended there, one might reasonably contend that Wife's reply—"I will agree to sell"—was not an unequivocal acceptance.[39] If that were so—and we need not decide that issue—then it would follow that, that as of August 24, there was no contract between Husband and Wife. But the parties' correspondence did not end there.

On August 25, after Wife said she "will agree," Husband gave Wife two options for the Sale—he offered to buy her interest by the end of September 2022 for $586,643.20 or on May 1, 2023, for $605,000. Again, Husband gave Wife a deadline to respond to his offer. When Wife did not immediately respond, Husband followed-up on August 27 with the same offer. That same day, well before Husband's deadline, Wife responded with a clear acceptance—she wrote "I *accept* your calculation and want to do it as of Sept 2022."[40] Husband acknowledged Wife's

---

[37] App. to Opening Br. at A66 (emphasis added).

[38] *Id.* at A68.

[39] *See Kokorich v. Momentus Inc.*, 2023 WL 3454190, at *8 (Del. Ch. May 15, 2023) (citing 2 Richard A. Lord, *Williston on Contracts* § 6:10 (4th ed. May 2023 update)) (finding that the language "will agree" does not convey a present intent to be bound), *aff'd*, 308 A.3d 1192 (Del. 2023) (TABLE).

[40] App. to Opening Br. at A72 (emphasis added).

acceptance that same day when he replied, "Yes. We can do that,"[41] and again on August 30, when Husband emailed Wife, "we have agreed that I will write you a personal check for $586,643.20 in exchange for a release of all remaining residual interest in [the Dover Property]."[42] Therefore, as of August 27, Husband and Wife clearly entered into a contract.

Despite this unequivocal offer and acceptance, the Family Court found that the parties' email messages were insufficient to form a contract. It did not find that there was no offer and acceptance, but rather that the August 27 email exchange did not contain all terms material to the agreement. Specifically, the court concluded that the "parties did not have an understanding of what Wife was selling"—interest in the LLC or the real estate that the LLC owned—and had not worked through the tax implications of the Sale.[43] Additionally, the court found that the parties did not intend for the email messages to bind them. We disagree. As we develop more fully below, the Family Court did not adequately consider the content of parties' email exchanges when determining what terms were material and placed undue weight on the parties' intention to memorialize their agreement in the Settlement Stipulation.

[41] *Id.* at A73.
[42] *Id.* at A75.
[43] Opinion at 10.

15

1

To form a contract, the parties must agree to all material terms of the contract. Determining whether a term is material to a contract does not lend itself well to a one-size-fits-all approach. Rather, "[w]hat terms are material is determined on a case-by-case basis, depending on the subject matter of the agreement and on the contemporaneous evidence of what terms the parties considered essential."[44]

2

We first address the Family Court's conclusion that "the parties did not seem to agree on what exactly they were exchanging."[45] Granted, Husband's offer referred to the subject matter of the Sale as Wife's "shares of the building," while Wife's email correspondence in response referred to it as her interest in the LLC in whose name the building was titled. But as the court itself noted in its opinion, the parties have used terms interchangeably to describe the interest being sold, sometimes referring to it as the "Dover Commercial Property" and sometimes by the name of the LLC. And more to the point, there is no evidence in the record remotely suggesting that the parties did not understand what they were exchanging, regardless of whether they called it Wife's interest in the "property," the "building," or the LLC. Neither Husband nor Wife, moreover, exhibited any confusion about the

---

[44] *Eagle Force I*, 187 A.3d. at 1230.
[45] Opinion at 9.

16

interest that was being sold. Accordingly, we are not persuaded that the parties' inexact naming of the object of the Sale is of any substantive moment in the analysis of whether a contract was formed.

According to the Family Court, the tax implications of the Sale—an issue not covered in the parties' email exchanges—were essential because Husband refused to close the Sale until the tax issue was resolved. But given Husband's omission of any reference to that tax issue in his offer to purchase Wife's interest, his later refusal to close the Sale until the tax issue was decided does not transform that issue into a material term. It is more appropriate to examine the contemporaneous evidence and, in particular, Husband's and Wife's email exchanges leading up to the August 27 agreement to determine whether the tax implications for each party were essential to the Sale.

When, in January 2022, Husband first floated the idea of buying Wife's interest, he said that he was "not sure if [Wife] would now have to pay taxes" if she chose to sell her interest to him.[46] Husband thus acknowledged that someone would have to pay taxes associated with the Sale and implied that it could be Wife's problem. Despite his awareness of possible tax implications, Husband never raised the question again in his multiple offers to Wife. Husband did not raise the issue on August 3, 2022 when he offered to purchase Wife's interest; on August 5, 2022,

---

[46] App. to Opening Br. at A94.

17

when he asked Wife again about buying her interest; on August 25, 2022 when he gave Wife the September 2022 and May 2023 buying options; on August 27, 2022 when he emailed Wife again about which buying option she preferred; and finally, on August 27, 2022 when he emailed Wife, "Yes. We can do that" after she accepted his offer.[47]

The first time Husband actually raised the tax-implication subject was when he emailed Wife's attorney on October 24, 2022—almost a full month after the Sale was initially set to occur. Tellingly, Husband raised the tax issue only after he expressed hesitation about moving forward with the Sale. Husband was clearly suffering from buyer's remorse, as evidenced by his emails in late September, in which he told Wife that he could make more money investing in stocks and bonds than he could from buying her interest.[48] And more revealing than that was Husband's omission of any reference to the tax issue in the Settlement Stipulation— drafted by Husband's own lawyer—which Husband sent to Wife in September. In sum, it seems evident that Husband raised the tax issue as an afterthought brought

---

[47] *Id.* at A73. It bears noting that the concern Husband raised in the October 24 email—that he would not be able to increase his cost basis in the Dover Property—was promptly dispelled by Wife's attorney, who noted that, from a tax standpoint, the Sale would be a "negative" for Wife. *Id.* at A120.

[48] *See id.* at A77 ("I am not 100 percent sure I want to do this now with the way the real estate market is and the stock market vs. just keeping the cash and putting it in the stock market in the near future."); *id.* at A79 ("A [t]wo year bond is now paying over 4 percent interest and you can get them tax free.").

18

on by his remorse over the deal he struck in August. Seen in this light, the issue was immaterial to the agreement that the parties struck on August 27.

By crediting Husband's *ex post* rationalization for renouncing his agreement to purchase Wife's interest in the Dover Property to the virtual exclusion of the contemporaneous evidence of what the parties deemed essential to the agreement, the Family Court reached the clearly erroneous conclusion that an enforceable contract had not been formed.

### 3

We turn next to the Family Court's conclusion that a contract was not formed because there was no manifestation of mutual assent. Specifically, the Family Court found that Husband and Wife did not intend to be bound by their email messages because they agreed to memorialize the agreement in the Settlement Stipulation. The court found that Husband did not intend to be bound by the email messages because he insisted that the parties sign the Settlement Stipulation and expressed hesitation about proceeding with the Sale. The court found further that Wife also did not intend to be bound by the email messages. According to the court there was "no persuasive evidence" that Wife intended to be bound by the parties' proposed agreement because she never signed the Settlement Stipulation, and, instead, directed her attorney to make changes to it.[49]

---

[49] Opinion at 11.

19

It is the "overt manifestation of assent—not subjective intent—[that] controls the formation of a contract."[50] In determining whether an overt manifestation of assent has occurred in a particular case, we "look[] to the parties' intent as to the contract as a whole, rather than analyzing whether the parties possess the requisite intent to be bound by each particular term."[51] Additionally, "in applying this objective test for determining whether the parties intended to be bound, the court reviews the evidence that the parties communicated to each other up until the time that the contract was signed—*i.e.*, their words and actions—including the putative contract itself."[52] In our view, the parties' email exchanges in August 2022 clearly and overtly manifested assent to the Sale.

Husband emailed Wife multiple times to express his desire to purchase Wife's interest in the Dover Property. Husband went so far as to send Wife a follow-up email after she did not respond to his first email, where he explicitly stated, "I can write you a personal check for the $605,000 that [I] can pay you immediately if [i]nterested. . . . I will assume if you don't respond by [A]ugust 31, 2022 that you are not interested."[53] Additionally, on August 30, Husband emailed Wife, stating, "As per our recent communication, *we have agreed* that I will write you a personal

[50] *Eagle Force II*, 235 A.3d at 735 (quoting *Eagle Force I*, 187 A.3d at 1229).
[51] *Eagle Force I*, 187 A.3d at 1229.
[52] *Id.* at 1229–30 (citing *Black Horse Cap., LP v. Xstelos Hldgs., Inc.*, 2014 WL 5025926, at *12 (Del. Ch. Sept. 30, 2014)).
[53] App. to Opening Br. at A66.

check for $586,643.20 in exchange for a release of all remaining residual interest in the [Dover Property]."[54] Wife's actions also manifested an intent to be bound. Wife's email on August 24 stated, "I *will agree* to sell my interest in [the Dover Property] to you for $605,000,"[55] and Wife's email on August 27 stated, "I *accept* your calculation and want to do it as of Sept 30, 2022."[56] We cannot look past the parties' use of the terms "agreement," "will agree," and "accept," and determine that overt manifestation was not present. This unambiguous language clearly demonstrates that the parties intended to be bound by their August 27 email exchange.

In reaching the opposite conclusion, the Family Court placed undue weight on the fact that the parties did not sign the Settlement Stipulation. That parties intend to "prepare and adopt a written memorial" of an agreement "will not prevent contract formation if the evidence reveals 'manifestations of assent that are in themselves sufficient to conclude a contract.'"[57] In other words, merely because parties wish to adopt a written memorial of an agreement does not mean that a memorialization is required for an enforceable contract to have been formed. As of August 27, a valid and enforceable contract existed between Husband and Wife. Although Husband

---

[54] *Id.* at A75 (emphasis added).
[55] *Id.* at A68 (emphasis added).
[56] *Id.* at A72 (emphasis added).
[57] *Loppert v. WindsorTech, Inc.*, 865 A.2d 1282, 1288 (Del. Ch. 2004) (quoting Restatement (Second) of Contracts § 27 (Am. L. Inst. 1981)), *aff'd*, 867 A.2d 903 (Del. 2005) (TABLE).

and Wife intended to sign the Settlement Stipulation to memorialize this agreement and the release that was part of it, the fact that it was never signed does not invalidate the contract that was formed on August 27, 2022.

## C

Next, the Family Court found that, even if there was a contract, the parties' signing of the Settlement Stipulation was a condition precedent to the Sale. Whether a condition precedent exists is a question of contract interpretation, the answer to which we review *de novo*.[58] A condition precedent is a condition that "must be performed or happen before a duty of immediate performance arises on the promise which the condition qualifies."[59] A condition precedent may consist of "either an act of a party that must be performed or a certain event that must happen before a contractual right accrues or a contractual duty arises."[60] The use of terms like "'if,' 'provided that,' 'on condition that,' or some other phrase that conditions performance" usually connote "an intent for a condition rather than a promise."[61]

---

[58] *See Aveanna Healthcare, LLC v. Epic/Freedom, LLC*, 2021 WL 3235739, at *25 (Del. Super. Ct. July 29, 2021) (citing *Casey Emp. Servs. Inc. v. Dali*, 634 A.2d 938, 1993 WL 478088, at *4 (Del. Nov. 18, 1993) (TABLE) (subjecting claim that a disputed contract term created a condition precedent to plenary review)).

[59] 13 Richard A. Lord, *Williston on Contracts* § 38.7 (4th ed. May 2024 update).

[60] *Id.*

[61] *See Murphy Marine Servs. of Delaware, Inc. v. GT USA Wilm., LLC*, 2022 WL 4296495, at *12 (Del. Ch. Sept. 19, 2022) (quoting 13 Richard A. Lord, *Williston on Contracts* § 38.16 (May 2022 update)).

The parties' understanding that the "contract should be formally drawn up and put in writing [does] not leave the contract incomplete without binding force," unless there is "a *positive agreement* that it should not be binding until so reduced to writing and formally executed."[62] Thus, the narrow question here is whether the parties positively agreed that there was no binding contract until the Settlement Stipulation was signed.[63]

The Family Court found that Husband made it clear that the parties' signing of the Settlement Stipulation was a condition precedent. To support this conclusion, the court relied on Husband's August 27 email, in which Husband wrote that "[t]here is not much left to do except for you to sign a release,"[64] as well as Husband's email on September 29 stating that he would like to have the Settlement Stipulation notarized at his attorney's office. The court also pointed to Wife's September 21 email, in which she stated that the Sale date may need to be pushed back so that her attorney would have sufficient time to review the Settlement Stipulation. In the

---

[62] *Universal Prods. Co. v. Emerson*, 179 A. 387, 394 (Del. 1935) (emphasis added). *See also Grunstein v. Silva*, 2014 WL 4473641, at *18 (Del. Ch. Sept. 5, 2014) (finding that parties' mention of executing a written agreement was not "an unequivocal statement that a written executed contract was a condition precedent to an agreement."), *aff'd*, 113 A.3d 1080 (Del. 2015) (TABLE).

[63] *See Loppert,* 865 A.2d at 1287 n.33 ("Positive" is defined as follows: "Laid down, enacted, or prescribed. Express or affirmative. Direct, absolute, explicit." (quoting *Black's Law Dictionary* 1324 (4th ed. 1968))).

[64] Opinion at 11 (quoting App. to Opening Br. at A69).

Family Court's view, the parties' mere references to a written release and desire to get it signed were sufficient to establish a condition precedent. We disagree.

Here, the Settlement Stipulation was not a condition precedent to the Sale. There is no evidence in the record that the parties positively agreed to be bound only if the Settlement Stipulation was signed. At most, the record indicates that the parties desired to have their agreement and Wife's release of Husband memorialized in writing. The parties formed an enforceable contract on August 27 when Wife told Husband, "I accept your calculation and want to do it as of Sept 30, 2022."[65] At that moment, there was no other act or condition that needed to occur to make the contract enforceable.

Furthermore, none of the offers that Husband made to Wife contained language indicating that a condition precedent existed. In Husband's August 5 offer, he wrote, "I can write you a personal check . . . that I can pay you immediately if interested." Husband did not say, "I can pay you immediately, *if you sign a written release*." In Husband's offer on August 25, he wrote, "So if you are okay with me giving you a check . . . and you sign a release at the time of receipt of check, I am good." Husband did not write, "So if you are okay with me giving you a check, *provided that* you sign a release . . . ." Finally, Husband's August 27 offer, which Wife unequivocally accepted, did not even mention a signed writing. The lack of

---

[65] App. to Opening Br. at A72.

conditional language in the Husband's offers demonstrates that the signing of the Settlement Stipulation was not a condition precedent. The parties merely sought to memorialize their agreement by signing the Settlement Stipulation.

D

In the final step of its contractual analysis, the Family Court found that, even if the email messages formed a contract and there was no condition precedent, Wife still could not enforce the contract because she acquiesced in Husband's repudiation. Under this alternative finding, the court reasoned that Husband repudiated the contract on September 21, 2022 when he said, "I am not 100 percent sure I want to do this . . .", and that Wife acquiesced in his repudiation by continuing to email back and forth with Husband.[66] The Family Court also found that Wife's proposed modifications to the Settlement Stipulation constituted a new deal altogether that included terms more favorable to her.

We reject the Family Court's finding that Wife acquiesced. A party is deemed to have acquiesced to a complained-of act, such as a repudiation of a contract, when the party

> has full knowledge of his rights and the material facts and (1) remains
> inactive for a considerable time; or (2) freely does what amounts to
> recognition of the complained of act; or (3) acts in a manner

---

[66] Opinion at 12.

25

inconsistent with the subsequent repudiation, which leads the other party to believe the act has been approved.[67]

Whether a party acquiesced to a repudiation is "fact-specific and context-specific."[68] Thus, our analysis of "acquiescence is fact intensive, often depending, as here, on an evaluation of the knowledge, intention and motivation of the acquiescing party."[69]

We do not view Wife's actions as acquiescing in Husband's repudiation. Husband expressed doubts about whether he wanted to go through with the Sale. In response, Wife and her attorney continued to discuss tax implications—a non-material term—with Husband in an attempt to resolve Husband's concerns and prompt his performance. Furthermore, Wife's communication after Husband's repudiation was not inconsistent with the original contract; rather, it appears that Wife and her attorney were attempting in good faith to work out disagreements with Husband before litigating the issue.

The Family Court likened this case to *Stallings v. Stallings*, in which this Court upheld the Family Court's determination that a husband had acquiesced in a wife's repudiation when he continued to negotiate with her after she refused to sign a separation agreement.[70] There, the husband had continued to litigate and negotiate

---

[67] *Klaassen*, 106 A.3d at 1047 (quoting *Cantor Fitzgerald, L.P. v. Cantor*, 724 A.2d 571, 582 (Del. Ch. 1988)).
[68] *Stallings v. Stallings*, 303 A.3d 1230, 2023 WL 5368362, at * 3 (Del. 2023) (TABLE).
[69] *Julin*, 787 A.2d at 84.
[70] *See* Opinion at 12–13 (citing *Stallings*, 2023 WL 5368362).

with wife until two months before trial, and in doing so acted inconsistently with the separation agreement.[71]  The husband had also appeared interested in renegotiating or repudiating specific terms in the separation agreement.[72]  *Stallings* is inapplicable here.  Wife did not act inconsistently with the Sale—she did not accept Husband's lower sale offer of $500,000, nor did she agree to add a statement about tax implications to the Settlement Stipulation.  Wife merely sought to enforce the Sale under its original terms.

The Family Court also found that Wife's modifications to the Settlement Stipulation constituted a new agreement that contained terms more favorable to her.  This conclusion, however, is unsupported by the record.  Wife made no substantive changes to the Settlement Stipulation.  Wife's suggested modifications related to clarifying that she was not a member of the LLC and adjusting the price to account for the later closing date.  Thus, Wife never acted inconsistently with the original contract that the parties formed in their email messages on August 27.  Additionally, Wife did not remain inactive for a considerable amount of time, nor did Wife ever freely recognize Husband's repudiation—she steadfastly insisted that the tax implications were not relevant to the Sale and reminded Husband about the original terms of their agreement.  Therefore, we do not find that Wife acquiesced in

---

[71] *Stallings*, 2023 WL 5368362, at *3.
[72] *Id.*

27

Husband's repudiation. The Family Court's findings to the contrary are not supported by the record.

## III

We turn finally to Wife's alternative claim for relief. As mentioned above, Wife requested, as an alternative to specific performance, that the Family Court modify the Ancillary Order to effectuate the Sale at the agreed-upon price. Under 13 *Del. C.* § 1519(a)(3), a modification or termination of an order for the disposition of property stemming from divorce can only be made "upon a showing or circumstances that would justify the opening or vacation of a judgment under the Rules of the Superior Court." Superior Court Civil Procedure Rule 60(b)(6) allows the court to modify the order for "any other reason justifying relief from the operation of the judgment." "A party seeking modification must satisfy an 'extraordinary situation or circumstances' test, which requires more than a mere change of position."[73]

Wife did not ground her request to modify the Ancillary Order in the parties' agreement as reached in the email correspondence—discussed at length above—in which Husband agreed to purchase the Dover Property for a sum certain. Put differently, Wife did not ask the court to modify the Ancillary Order on the grounds

---

[73] *Stanley v. Stanley*, 956 A.2d 1, 3 (Del. 2008) (quoting *Campbell v. Campbell*, 522 A.2d 1253, 1254 (Del. 1987)).

that the parties in effect agreed to the modification. Instead, Wife alleged that the intent of the parties when they consented to the terms of the Ancillary Order had been frustrated by subsequent developments. Wife alleged that the Ancillary Order's "splitting of income from the [Dover Property] was intended to be temporary until Husband's interest in the property or the property itself was sold."[74] She then listed a host of reasons why the sale of the property had been impracticable.

Because Wife framed her request in this way, the Family Court made short work of it:

> Wife appears to be alleging the parties were mistaken as they anticipated the building would sell more quickly. When the case involves a consent judgment, relief is only available when the mistake is mutual between the parties. Likewise the Court does not find that there was evidence of "extraordinary circumstances" warranting Rule 60(b) relief in the interest of justice. The Court cannot modify where the party "had [their] day in Court" but is unhappy with the settlement. There must be an end to litigation. Both parties had the opportunity to finalize the distribution of this asset at the ancillary hearing.[75]

To support this conclusion, the court cited *D.J.C. v. C.B. F.*,[76] a 2006 Family Court order denying a party's motion under Family Court Civil Rule 60(b) for relief from a property division order. The court in that case relied on this Court's clear pronouncement in *Campbell v. Campbell* concerning the proper role of Rule 60(b)(6) in marital property division cases:

---

[74] App. to Opening Br. at A38.
[75] Opinion at 13 (footnotes omitted).
[76] 2006 WL 2389276 (Del. Fam. Ct. Feb. 14, 2006).

29

A judgment which seeks finally to resolve the terms of a previous relationship should not be revisited simply because there is a post-judgment change in circumstances. Even the all-encompassing language of Rule 60(b)(6) does not contemplate that result. . . . Where property rights have vested as a result of the judgment, even though when measured by subsequent events the terms of the judgment may seem to work a disparity, those rights should not be disturbed. . . . The need for finality, particularly in the property aspects of final judgments in marital disputes, precludes modification in circumstances which might permit reopening of a hearing after the conclusion of evidence but before the entry of the judgment.

To permit the opening of final judgments in divorce actions to modify property awards based on a post-judgment change of circumstances not only ill serves the principle of finality but would lead to chaotic results. If post-judgment ill fortune can justify reallocation, so too should a subsequent beneficial change of circumstances which alters the comparative financial positions of the parties. An unexpected inheritance or gift which was not factored into the property allocation may "enrich" one party to the point where the property previously awarded is disproportionate to present needs. To entertain reopening of final judgments on such grounds would lead to endless applications based on little more than turns of fate.[77]

Here, we see no error in the Family Court's faithful application of these principles to Wife's request—as framed—for modification of the Ancillary Order.

We note, however, that the Family Court's disposition of Wife's Petition as a whole hinged largely on the court's determination that the parties had not formed an enforceable contract to allocate their interests in the Dover Property—a resolution that inarguably departs from the terms of the Ancillary Order. In light of our reversal of that determination, we conclude that it is appropriate to remand this matter to the

---

[77] *Campbell*, 522 A.2d at 1255.

Family Court to consider what, if any, remedial relief is appropriate and within the court's jurisdiction to grant.

IV

For the reasons set forth above, we REVERSE the judgment of the Family Court and REMAND for further proceedings consistent with this opinion. Jurisdiction is not retained.